UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ROCK SOUND COMMUNICATIONS CORP.,

    Plaintiff,

vs.

CASE NO.

ATLAS COMMUNICATIONS, LTD.,

    Defendant.
_____/

**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
WITHOUT NOTICE AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, Rock Sound Communications Corp. ("Rock Sound"), moves this Court for entry of an Emergency Temporary Restraining Order Without Notice against Atlas Communications, Ltd. ("Atlas") pursuant to Fed. R. Civ. P. 65(b) and S.D. Fla. L. R. 7.1 and states the following as grounds:

### INTRODUCTION

Rock Sound Communications Corp. seeks a emergency temporary restraining order preventing Atlas Communications, Ltd. from unilaterally terminating service it is providing Rock Sound Communications Corp. As more fully described below and in the attached papers, such cut off of service is without merit, is effectively destroying the company, and will cause harm to an excess of 1.5 million members of the general public which are holding telephone cards which have been issued by Rock Sound Communications, and 1.3 million dollars to Rock Sound Communications. Further, as more fully demonstrated in the attached affidavits, this temporary restraining order is sought without notice because, Atlas Communications, Ltd. have

**ZUCKERMAN, SPAEDER, TAYLOR & EVANS, LLP**

made it very clear that if anything but acceding to their demands is done, it will immediately effectuate the termination of service thereby mooting any need for a temporary restraining order.

## Facts

3.  Rock Sound Communications Corporation ("Rock Sound") is a recently formed company which provides telephone card services to the general public and, concomitantly with that service, provides telephone carrier service for the users of that card.

4.  Rock Sound became an operating company on January 7, 2000, upon the acquisition of substantially all of the assets of two other corporations - U.S. Digitel, Inc. ("U.S. Digitel") and Telecard Dispensing Corporation ("Telecard"), both of which are Florida Corporations.

5.  The business of Rock Sound is to sell pre-paid telephone cards to the general public. Rock Sound Communications Corporation, within the industry, would be denominated as a "facility based pre-paid telephone card provider." Thus, in addition to providing the telephone card itself, Rock Sound is also a carrier, in that it must enter into contracts with long distance carriers, in addition to providing its own switching facilities, so that when a holder of the card uses the card, they call an 800 number and that number then goes to a switch, which is owned by Rock Sound, which in turn routes it to an appropriate long distance and terminating carrier.

6.  It is customary in the industry for companies such as Rock Sound not to enter into contracts directly with carriers, but to enter into such contracts through companies that are called aggregators. The aggregator that U.S. Digitel contracted for, is a company called Atlas Communications, Ltd. Upon information and belief, Atlas Communications, Ltd. ("Atlas") is a Pennsylvania Corporation with its principal place of business in Blue Bell, Pennsylvania. The

relationship with Atlas was one of the principal assets, if not the definitive asset, acquired by Rock Sound Communications at the time it acquired U.S. Digitel.

7. Prior to the acquisition of U.S. Digitel, Mike Spurlin, President of Atlas communicated to Rock Sound on numerous occasions that Atlas was fully aware of the potential acquisition of U.S. Digitel's assets. The management at Atlas was quite pleased with the potential acquisition because they were unhappy with their business dealings with the prior management of U.S. Digitel.

8. Atlas charges for its services on a per minute charge. Prior to Rock Sound's acquisition of substantially all the assets of U.S. Digitel, Atlas was charging U.S. Digitel a rate of .0415 cents per minute.

9. However, upon information and belief, and discussions with the prior management of U.S. Digitel by Atlas, Atlas represented to the prior corporations that they were going to be able to substantially reduce those rates because of new contracts with various carriers, specifically with Quest Communications Corporation. Based on those representations, U.S. Digitel made Atlas its exclusive aggregator and became wholly reliant on Atlas.

10. Further, before Rock Sound's acquisition of the assets of U.S. Digitel, Mike Spurlin, President of Atlas, represented to Rock Sound that it was going to be able to substantially reduce the rates and that these new rates would go into effect post closing on the acquisition of U.S. Digitel.

11. Prior to Rock Sound acquiring the assets of U.S. Digitel, Mike Spurlin, President of Atlas, communicated with the Chief Financial Officer of U.S. Digitel, John Scafidi. At the time of these conversations, Mr. Scafidi knew that he was going to become CFO of Rock Sound upon the completion of the acquisition. On January 6, 2000, Mr. Spurlin, on behalf of Atlas, represented that in an effort to induce Rock Sound to acquire U.S. Digitel and continue the

relationship with Atlas, the new, lower Quest rate would be placed into effect at the time Rock Sound acquired the assets of U.S. Digitel.

12. Based on these representations, Rock Sound went forward and completed its acquisition of substantially all of the assets of U.S. Digitel and Telecard.

13. It was a substantial and critical part of the decision of Rock Sound to acquire these companies, that these new rates be in effect. Without the representations of this reduction in rates, there would have been no acquisition because the company would not have been viable.

14. Indeed, Rock Sound Communications Corporation, in its negotiations with its lenders, made financial projections based upon the new Quest rates.

15. Before Rock Sound even received its first bill, a bill for sums still owed by U.S. Digitel in the sum of approximately $700,000 was sent to Rock Sound. Atlas demanded immediate payment of that $700,000, or they would "pull the plug" on services. In order to protect Rock Sound's substantial investment, and not to effectively destroy the company, Rock Sound immediately wired the $700,000 to Atlas (January 13-14, 2000). Ultimately, Rock Sound will take those payments and charge them against the debt owed on the acquisition of the company, U.S. Digitel.

16. Upon receiving the first invoice from Atlas for Rock Sound and analyzing the invoice, it became readily apparent that the new rates represented to be in effect, were not being put into effect, and Rock Sound was being billed under the old rate of 4.15 per minute. This effectively meant that Rock Sound was generating insufficient revenues and created a "losing" company. The more Rock Sound sold the more money it lost.

17. Rock Sound immediately contacted Atlas to address this matter and the President, Mike Spurlin, once again indicated that the new rates would go into effect and would work with

Rock Sound in dealing with the payment situation. He further indicated that he would have to talk to the chairman of the company, Frank Scardino, to get this approved.

18.  At closing, Rock Sound received a call from Mike Spurlin, President of Atlas. He demanded, that if he did not receive $800,000 owed by the prior company immediately he would "pull the plug," effectively destroying the company which was being formed. Rock Sound was forced to immediately wire $800,000 to Atlas and then took it as a deduction of the purchase price of the assets of U.S. Digitel, Inc.

19.  The foregoing facts are supported by the Affidavits of Henry Ritter, John Scafidi, and Alan H. Lipkowitz.

20.  Contemporaneous to the instant Motion, Rock Sound has filed suit against Atlas for its wrongful acts.

## Temporary Restraining Order

21.  The grant or denial of a motion for preliminary injunction is a decision within the sound discretion of the trial court. *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir. 1983). That discretion is guided by four requirements: (a) a substantial likelihood that movant will ultimately prevail on the merits; (b) that it will suffer irreparable injury if the injunction is not issued; (c) that the threatened injury to the movant outweighs the potential harm to the opposing party; and (d) that if the injunction is issued, it would not be adverse to the public interest. *Haitian Refugees Center, Inc. v. Nelson,* 872 F.2d 1555, 1561-62 (11th Cir. 1989). A temporary restraining order may be granted without notice if immediate and irreparable inquiry will result to the movant before the adverse party can be heard in opposition. Fed. R. Civ. P. 65(b). Based upon these requirements, Rock Sound is entitled to a Temporary Restraining Order.

ZUCKERMAN, SPAEDER, TAYLOR & EVANS, LLP

22. Rock Sound will suffer irreparable injury if Atlas is allowed to wrongfully discontinue its service because Rock Sound will literally cease to exist. Consequently, Rock Sound's 75 employees will be jobless and the over 4,000 distributors of Rock Sound's pre-paid phone service will no longer be able to sell that product. No monetary damages or coercive relief can resurrect Rock Sound once Atlas has unlawfully driven it out of business. Nor can the loss of jobs and the loss to the distributorships be quantified because too many variables and intangibles exist.

23. Unless this Temporary Restraining Order is entered, the public interest will be harmed. Based upon a phone card's average life expectancy of 45 days, over 1,300,000 people currently have active pre-paid phone cards issued through Rock Sound. If Atlas is allowed to wrongfully discontinue service, then these individuals will be unable to place any long distance calls for which they have already paid.

24. The balance of interests greatly favors entry of this Temporary Restraining Order. If the order is not entered, Atlas will carry through on its threat and cut off service to Rock Sound. Rock Sound will cease to exist, over one million people will not have long distance service for which they have paid, its employees will lose their livelihoods, and its distributors will have one less product to offer. On the other hand, if the Temporary Restraining Order is entered, Atlas will merely be ordered to continue performing under the contract. Assuming *arguendo* that Rock Island does not ultimately prevail, simple money damages will adequately compensate Atlas for any harm.

25. Rock Sound has a substantial likelihood of prevailing on the merits of its claims against Atlas. Atlas knew that Rock Sound was negotiating the purchase of U.S. Digitel and Telecard since July 1999. Atlas then represented to U.S. Digitel and Telecard that it would reduce its phone line access fees from $04.15 per minute to $03.10 per minute effective January

1, 2000. Atlas intended that U.S. Digitel and Telecard rely on this representation. In justifiable reliance on Atlas' representations, U.S. Digitel and Telecard discontinued its business relationships with all other telephone access line intermediaries. Atlas also intended that Rock Sound rely on this representation in order to maintain its position as exclusive access provider after Rock Sound purchased the assets of U.S. Digitel and Telecard. In justifiable reliance on these representations, Rock Sound did not contract with another telephone access provider.

26. Atlas' acts constitute a violation of Florida's Unfair and Deceptive Trade Practices Act, Chapter 501, Pt. II, Fla. Stat., which violations have damaged and continue to damage Rock Sound. Rock Sound is a consumer as defined by sec. 501.203(7), Fla. Stat.; *see also Big Tomato v. Tasty Concepts, Inc.* 972 F. Supp 662, 663 (S.D. Fla. 1997)(noting that the Florida's Uniform and Deceptive Trade Practices Act "was amended to include "businesses and corporations" as "consumers."). Atlas is involved in trade or commerce as defined by sec. 501.203(8), Fla. Stat. Atlas' aforementioned acts constitute unconscionable acts or practices, and unfair or deceptive practices in the conduct of any trade or commerce in violation of sec. 501.204

27. Rock Sound is an aggrieved person under the definition of Florida's Deceptive and Unfair Trade Practices Act and is therefore entitled to seek injunctive relief under sec. 501.211(1), Fla. Stat.

28. Atlas' conduct also constitutes a breach of its oral contract to provide access rates of $03.10 per minute and as Rock Sound's sole provider of service. Moreover, Atlas continues to threaten to immediately and unilaterally disconnect service for Rock Sound even though it has failed to perform under the oral agreement.

29. This Temporary Restraining Order should be entered without notice for two reasons: (a) Atlas has already threatened to discontinue service on January 21, 2000; and (b)

based upon reasonable belief and past dealings with Atlas, it will unilaterally disconnect service upon learning of these proceedings.

BASED UPON THE FOREGOING, Rock Sound Communications Corp. moves this Court for entry of a Temporary Restraining Order prohibiting Atlas Communications, Ltd. from discontinuing telephone access service to Rock Sound Communications and any other relief this Court deems just and equitable.

Respectfully submitted,

Ronald B. Ravikoff, Esquire
Florida Bar No. 0244155
John Arrastia, Jr., Esquire
Florida Bar No. 0072461
Alicia Shick, Esquire
Florida Bar No. 124842
Zuckerman, Spaeder, Taylor & Evans, LLP
201 South Biscayne Boulevard
Suite 900
Miami, Florida 33131
Telephone: (305) 579-0110
Facsimile: (305) 579-9749
Attorneys for Plaintiff Rock Sound

## **AFFIDAVIT OF ALAN H. LIPKOWITZ**

I, Alan H. Lipkowitz, being duly sworn and deposed say:

1. I make this Affidavit on personal knowledge.

2. I am President and on the Board of Directors of Rock Sound Communications Corporation, a Delaware Corporation, with its principal place of business at 1909 Tyler Street, Hollywood, Florida 33020.

3. Rock Sound Communications Corporation is a recently formed company which provides telephone card services to the general public and, concomitantly with that service, provides telephone carrier service for the users of that card.

4. Rock Sound Communications Corporation became an operating company on January 7, 2000, upon the acquisition of substantially all of the assets of two other corporations - U.S. Digital, Inc. and Telecard Dispensing Corporation, both of which are Florida Corporations.

5. The business of Rock Sound Communications Corporation is to sell pre-paid telephone cards to the general public (a copy of one of these cards is attached hereto). Rock Sound Communications Corporation, within the industry, would be denominated as a "facility based pre-paid telephone card provider." Thus, in addition to providing the telephone card itself, Rock Sound Communications Corporation is also a carrier, in that it must enter into contracts with long distance carriers, in addition to providing its own switching facilities, so that when a holder of the card uses the card, they call an 800 number and that number then goes to a switch, which is owned by

1

Rock Sound, which in turn routes it to an appropriate long distance and terminating carrier.

6. It is customary in the industry for companies such as Rock Sound Communications Corporation not to enter into contracts directly with carriers, but to enter into such contracts through companies that are called aggregators. The aggregator that U.S. Digital contracted for, is a company called Atlas Communications, Ltd. Upon information and belief, Atlas Communications, Ltd. is a Pennsylvania Corporation with its principal place of business in Blue Bell, Pennsylvania. The relationship with Atlas Communications was one of the principal assets, if not the definitive asset, acquired by Rock Sound Communications at the time it acquired U.S. Digital, Inc.

7. Prior to the acquisition of U.S. Digital, Inc., I had numerous conversations with the principals of Atlas Communications, Ltd., regarding my acquisition of that company. I specifically spoke to Mike Spurlin, President of Atlas Communications. I was informed by Mr. Spurlin, that they were fully aware of my potential acquisition of U.S. Digital's assets and were quite pleased with it because they were unhappy with their business dealings with the prior management of U.S. Digital, Inc.

8. Atlas Communications, Ltd. charges for its services on a per minute charge. Prior to my acquisition of substantially all the assets of U.S. Digital, Inc., Atlas Communications, Ltd. was charging U.S. Digital, Inc. .0415 cents per minute.

9. However, upon information and belief, and discussions with the prior management of U.S. Digital, Inc., by Atlas Communications, Ltd., represented to the

2

prior corporations that they were going to be able to substantially reduce those rates because of new contracts with various carriers, specifically with Quest Communications Corporation. Based on those representations, U.S. Digital, Inc. made Atlas Communications, Ltd. its exclusive aggregator and became wholly reliant on Atlas Communications, Ltd.

10. Further, before my acquisition of the assets of U.S. Digital, Inc., I also had conversations with representatives of Atlas Communications, Ltd., specifically Mike Spurlin, who also represented to me that they were going to be able to substantially reduce the rates and that these new rates would go into effect immediately post closing.

11. Based on these representations, Rock Sound Communications Corporation went forward and completed its acquisition of substantially all of the assets of these two companies (U.S. Digital, Inc. and Telecard Dispensing Corp.).

12. It was a substantial and critical part of the decision of Rock Sound Communications Corporation to acquire these companies, that these new rates be in effect. Without the representations of these reduction in rates, there would have been no acquisition because the company would not have been viable.

13. Indeed, Rock Sound Communications Corporation, in its negotiations with its lenders, made financial projections based upon the new Quest rates.

14. These representations were also made to Rock Sound by the CFO of U.S. Digital, Inc., John Scifidi, who received these representations from Atlas Communications, Ltd.

3

15. At all times, Atlas Communications, Ltd. knew that Rock Sound was acquiring these assets based on the new Quest rates and understood that Rock Sound was entering this business solely because of the new Quest rates, Rock Sound would not have acquired these assets without these new Quest rates. Atlas Communications made representations to Rock Sound, directly or indirectly that the new rates would come into effect, or made material omissions of fact by failing to tell Rock Sound that the new rates would not go into effect.

16. At closing, Rock Sound received a call from Mike Spurlin, President of Atlas Communications. He demanded, that if he did not receive $800,000 owed by the prior company immediately he would "pull the plug," effectively destroying the company which was being formed. Rock Sound Communications Corporation was forced to immediately wire $800,000 to Atlas Communications, Ltd. and then took it as a deduction of the purchase price of the assets of U.S. Digital, Inc.

17. The total purchase price of U.S. Digital, Inc. assets, which included the rights to the Atlas relationship, was $10 million. In addition, Rock Sound Communications paid $4 million for Telecard Dispensing Corporation assets. Accordingly, all of Rock Sound Communications' $14 million investment in these two companies was solely dependent on the relationship with Atlas Communications, Ltd. and Atlas was fully aware of this.

18. The procedure for dealing with Atlas Communications billing was for Atlas to bill on an estimated weekly interval, on a weekly in arrears basis, and payment is

4

due five (5) days from the date of invoice. Reconciliation is done at the end of the month.

19.  Before Rock Sound even received its first bill, a bill for sums still owed by U.S. Digital, Inc. in the sum of approximately $700,000 was sent to Rock Sound. Atlas Communications demanded immediate payment of that $700,000, or they would "pull the plug." In order to protect Rock Sound's substantial investment, and not to effectively destroy the company, Rock Sound immediately wired the $700,000 to Atlas (January 13-14, 2000). Ultimately, Rock Sound will take those payments and charge them against the debt owed on the acquisition of the company, U.S. Digital.

20.  Upon receiving the first invoice from Atlas for Rock Sound and analyzing the invoice, it became readily apparent that the new rates represented to be in effect, were not being put into effect and Rock Sound was being billed under the old rate of .0415 cents/minute. This effectively meant that Rock Sound was generating insufficient revenues and created a "losing" company. The more we sold the more money we lost.

21.  Rock Sound immediately contacted Atlas Communications, Ltd. to address this matter and the President, Mike Spurlin once again indicated that the new rates would go into effect and would work with Rock Sound in dealing with the payment situation. He further indicated that he would have to talk to the chairman of the company, Frank Scardino to get this approved. This took place yesterday, January 19, 2000 at approximately 2:30 p.m. At approximately 5:00 p.m., both gentlemen called back and indicated that the deal was not acceptable and that they wanted yet another

$732,000 wired that day. They indicated that unless we promised to pay by Friday, they would yet again "pull the plug."

22.  Rock Sound indicated that it was unable to make that payment and they then said they would "give us until Friday" before pulling the plug.

23.  Rock Sound has essentially been, in my opinion, extorted by Atlas Communications, Ltd. given their business relationship with us and the misrepresentations they made to us and U.S. Digital, Inc. upon which we relied regarding the pricing structure. Accordingly, in its first days of operation, Rock Sound has paid Atlas Communications $1.5 million, yet services rendered to Rock Sound by Atlas Communications is only $673,000 and Atlas Communications is demanding yet another $732,000 by tomorrow. Effectively Atlas Communications forcing Rock Sound to pay the obligations of a predecessor company, U.S. Digital, Inc. and forcing Rock Sound into a position that is commercially untenable.

24.  If we do not receive immediate relief and prevent them from terminating the relationship with us, the company will essentially disappear. We currently have 75 employees who will lose their jobs, and over 4,000 distributors that will lose this business opportunity.

25.  There is no amount of compensation that can deal with the harm that will be caused, because effectively, the company will disappear, the employees will disappear, the relationships will disappear and they cannot be recreated.

26. In addition, all of the people that hold the cards will stop using the cards, and we will lose any ability to recreate those relationships. We currently have over 1,300,000 active cards in the hands of the general public.

27. Furthermore, based on personal information, I know that many people rely on these cards to deal with all of their telephone needs for both personal and emergency purposes, and there will be thousands, and possibly millions of people, who will be immediately cutoff from telephone service, without notice.

Under penalty of perjury, I swear that the above statements are true and correct to the best of my knowledge.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Alan H. Lipkowitz

SWORN AND SUBSCRIBED before me this 20th day of January 2000.

_____
Notary Public, State of Florida

DAWN MARIE WASHAM
MY COMMISSION # CC 742705
EXPIRES: May 28, 2002
1-800-3-NOTARY  Fl. Notary Service & Bonding Co.

7



## **AFFIDAVIT OF JOHN SCAFIDI**

I, John Scafidi, being duly sworn and deposed say:

1. I make this Affidavit on personal knowledge.

2. I am the Chief Financial Officer of Rock Sound Communications Corporation.

3. In my capacity as Chief Financial Officer and as part of my duties and responsibilities, I keep track of and am aware of the number of cards we sell to the public and how many distributors we have and the general turnaround in the sales of cards.

4. At the present time, based on our records, it is my understanding that we have in excess of 1,300,000 cards in the hands of the general public.

5. Generally, we sell in excess of 155,000 cards per week, and the average card is on the market for about 45 days.

6. In addition, we have 4,100 distributors who rely in part upon the sales of our cards for their income.

7. We currently have 75 employees on the payroll.

8. I had direct conversations with Mike Spurlin, President of Atlas Communications, Inc. prior to Rock Sound acquiring the assets of U.S. Digital, Inc. Those conversations, were part of the due diligence process on U.S. Digital, Inc. prior to Rock Sound's decision to acquire U.S. Digital, Inc.'s assets and enter into this relationship. Coincidentally, prior to me being CFO of Rock Sound, I was CFO of U.S. Digital, Inc. and was aware of the relationship with Atlas Communications, Ltd. At the time of these conversations I already knew I was going over to Rock Sound.

9. Atlas Communications represented to me through Mike Spurlin that they were very unhappy with the management of U.S. Digital, Inc. and of Telecard Dispensing Corporation and were pleased that new management was coming in. In an effort to induce Rock Sound to

1

come in and become new management for these companies, and continue the relationship with Atlas Communications, Spurlin represented to me, as a representative of Rock Sound Communications Corporation, that the new Quest rate would be put into effect at the time Rock Sound acquired the assets of the company. This conversation took place on Thursday, January 6, 2000.

10. Indeed, consistent with this conversation, I had subsequent conversations with Atlas Communications, specifically Mike Spurlin, President of Atlas Communications regarding the rates as they appeared on the first invoice that we received when we were doing business as Rock Sound. It is important to note, that this invoice was not for business being done by Rock Sound, but was an invoice to the old company, U.S. Digital, Inc. At that point, consistent with the representations that were made to me prior to the acquisition, Mike Spurlin said that they were going to "put the pencil to the paper" and implement the new Quest rates.

Under penalty of perjury, I swear that the above statements are true and correct to the best of my knowledge.

FURTHER AFFIANT SAYETH NAUGHT.

_____
JOHN SCAFIDI

SWORN AND SUBSCRIBED before me this ____ day of January 2000.

_____
Notary Public, State of Florida

DAWN MARIE WASHAM
MY COMMISSION # CC 742705
EXPIRES: May 28, 2002
1-800-3-NOTARY   Fla. Notary Service & Bonding Co.

2

## **AFFIDAVIT OF HENRY RITTER**

I, Henry Ritter, being duly sworn and deposed say:

1. I make this Affidavit on personal knowledge.

2. I am on the Board of Directors of Rock Sound Communications Corporation and hold the position of Executive Vice President.

3. On Wednesday, January 19, 2000, I had a telephone conversation with Mike Spurlin, President of Atlas Communications, Ltd. discussing the pricing on the invoice that we received.

4. This conversation took place at approximately 2:30 p.m. Mike Spurlin indicated to me that the new rates should be in effect, that they would reduce the rates, and they would work with us on the payment schedule. He indicated that he had to discuss this further with the Chairman of the Company, Frank Scardino.

5. At that point, we believed our relationship with Atlas Communications, Ltd. had been resolved and we could move forward.

6. At approximately 5:30 p.m. that afternoon, I received a call back from Mike Spurlin and Frank Scardino jointly, at which point they communicated to me that there was no agreement and that we were responsible for payment under the old rates and there was no discussion of reducing the rates going forward. They further demanded that we had to tell them how they were going to get paid $732,000, no later than Friday.

7. This effectively meant that the funds had to be wired to them, or they would again "pull the plug." They basically said that unless we gave them a promise to

pay by Friday, and a plan to pay they were going to pull the plug last night. We indicated there was nothing we could do until we saw what came in the cash flow the next day, at which point they gave us until Friday to make the payment.

8.  They made it very clear to me that anything other than full payment of the money or agreement to pay the money immediately would cause them to terminate our relationship, without any notice at all.

9.  It became clear to me that if they understood that we were seeking relief from the Court, they would immediately terminate our relationship before we even had a chance to seek relief from the Court and give the Court a chance to rule, thereby mooting this entire procedure. In fact they even threatened to cut off service in the middle of the night.

Under penalty of perjury, I swear that the above statements are true and correct to the best of my knowledge.

FURTHER AFFIANT SAYETH NAUGHT.

_____
HENRY RITTER

SWORN AND SUBSCRIBED before me this 20th day of January, 2000.

_____
Notary Public, State of Florida

DAWN MARIE WASHAM
MY COMMISSION # CC 742705
EXPIRES: May 28, 2002
1-800-3-NOTARY    Fla Notary Service & Bonding Co.

2