UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ROCK SOUND COMMUNICATIONS CORP.,

           Plaintiff,

vs.

ATLAS COMMUNICATIONS, LTD.,

           Defendant.

_____/

CASE NO. 00-6096-CIV-GOLD
Magistrate Judge Simonton

## PLAINTIFF'S VERIFIED RESPONSE TO DEFENDANT'S EMERGENCY MOTION REQUESTING INCREASE OF TRO BOND and TO DISMISS FOR LACK OF JURISDICTION

Defendant seeks to have the bond in this case increased from between $1 million to $10 million from the originally posted $10,000.

This position is consistent with Defendant's continuing efforts to try everything it can do to put this newly created company out of business. The underlying facts of the case, simply do not demonstrate that Defendant will be damaged by this Temporary Restraining Order until such time as a full preliminary injunction hearing can be held – another four (4) days.

Indeed, it is Plaintiff's position that not only is Defendant adequately protected, but that it is in fact, over secured for the exposure it has as a result of this Temporary Restraining Order.

To reiterate some of the pertinent facts outlined in Plaintiff's Motion. Plaintiff is a "facility based pre-paid telephone card provider," meaning that it is in the business of providing pre-paid telephone card services to the general public and providing telephone carrier service to the users of its cards. Plaintiff sells about 155,000 telephone cards per week to approximately

**ZUCKERMAN, SPAEDER, TAYLOR & EVANS, LLP**



4,100 distributors. The average telephone card is on the market for approximately 45 days and there are about 1.3 million telephone cards in the hands of the general public. Typically, a customer purchases a telephone card in various denominations and uses the telephone card by dialing a toll free number and special code. The cost of the customer's call is then deducted from the pre-payment balance remaining on his or her telephone card. When one of the Plaintiff's customers uses the telephone card, the call goes to a switch owned by the Plaintiff, and then the switch routes the call to an appropriate long distance carrier and terminating carrier. Although the Plaintiff acts as a long distance carrier, it does not own its own telephone lines so it must enter into contracts with long distance carriers to provide long distance service to the debtor's customers. In the Plaintiff's industry, it is customary for such facility based pre-paid telephone card providers not to enter into contracts directly with long distance carriers, but to enter such contracts indirectly through third parties called aggregators. The Defendant, Atlas Communications, Ltd. is Plaintiff's exclusive aggregator. That is, Atlas provides the sole door through which the life blood of the company flows.

Rock Sound Communications Corporation is seventeen (17) days old. It acquired the assets of a company called U.S. Digital, Inc. (see attached). It is important, indeed critical, to understand that Rock Sound did not purchase all of the liabilities of U.S. Digital, Inc. This is a fact that Atlas Communications, Ltd. fails to accept or recognize. This is so, despite the fact that this purchase agreement was sent to Atlas before Rock Sound acquired the assets of U.S. Digital, Inc.

As an example of its extraordinary power over this fledgling company, at the closing, Atlas threatened to kill the baby at its birth, if Rock Sound did not immediately send $800,000 to Atlas, which was owed by the predecessor company, U.S. Digital, Inc. In order to preserve its existence.

**ZUCKERMAN, SPAEDER, TAYLOR & EVANS, LLP**

2

Only a few days later, despite the fact that not a single bill had yet been rendered to Rock Sound, another demand was made for an additional $700,000 to Rock Sound again, to pay the debts of U.S. Digital, Inc. Again, dealing with these demands that gave only hours to respond, Rock Sound again made the payment in the hopes of keeping itself alive.

On or about January 14, 2000, the first bill which covered some portion of Rock Sound's obligations appeared, this bill was for $735,000, but only one day of this covered Rock Sound's existence. Further, the bill was at the old rate of U.S. Digital, Inc. and not the new rate that had been represented to Rock Sound. It is this bill which has prompted this current situation. Atlas Communications made immediate demand for the full payment of the $735,000 or they would once again, terminate service. Despite the fact that at best, one-seventh (1/7) of this bill was the responsibility of Rock Sound, and at the old rate would have been three-quarters (3/4). Accordingly, it is Rock Sound's best estimate that under the arrangement it entered with Atlas Communications, it did not owe $735,000, but more in the $75,000 range.

Rock Sound believes that it is incurring, at the old rate, fees in the amount of approximately $700,000 per month, and at the new rate they are approximately $522,000. Accordingly, the maximum damages that Atlas Communication can suffer for the wrongful entry of this Temporary Restraining Order, is one week's worth of services, which is $522,000. However, as demonstrated by the affidavits, they already hold payment of $700,000 which should be credited toward Rock Sound's account, not to mention the $235,000 they hold in addition, as security against future billings.

Accordingly, it is Rock Sound's position that Atlas currently holds credits of Rock Sound Communications in the amount of $900,000, when its maximum exposure is in the neighborhood of $522,000. Therefore, the nominal bond posted is more than adequate.

**ZUCKERMAN, SPAEDER, TAYLOR & EVANS, LLP**

The Court specifically requested Plaintiff to address its ability to post bond. As of this morning, Rock Sound Communications, in addition to the over $900,000 credit it holds with Atlas, has over $400,000 in operating capital and $800,000 in cash deposits. Further, had Atlas billed Rock Sound for only the services it had actually used, at the rate it actually promised, this company would be generating net cash flow (cash flow in excess of all expenses) in excess of $300,000 per week.

Respectfully submitted,

Ronald B. Ravikoff, Esquire
Florida Bar No. 0244155
John Arrastia, Jr., Esquire
Florida Bar No. 0072461
Alicia Shick, Esquire
Florida Bar No. 124842
Zuckerman, Spaeder, Taylor & Evans, LLP
201 South Biscayne Boulevard
Suite 900
Miami, Florida 33131
Telephone: (305) 579-0110
Facsimile: (305) 579-9749
Attorneys for Plaintiff Rock Sound

I, Alan H. Lipkowitz, declare under penalty of perjury under the laws of the United States of America that the above motion is true and correct.

Alan H. Lipkowitz, President
Rock Sound Communications Corporation

**ZUCKERMAN, SPAEDER, TAYLOR & EVANS, LLP**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served by **fax (without attachments) and by U.S. Mail (with attachments)** this **24**th day of January, 2000 to Howard M. Camerik, Esq., Blank, Rome, Comisky & McCauley, LP, 1200 N. Federal Highway, Suite 417, Boca Raton, Florida 33432.

Respectfully submitted,

Ronald B. Ravikoff, Esquire
Florida Bar No. 0244155

# ASSET PURCHASE CLOSING

# U.S. DIGITAL, INC.
# AND ROCK SOUND COMMUNICATIONS
# CORPORATION

## HELD JANUARY 7, 2000

**Re:**     **U.S. Digital, Inc.**
Date:      1/7/2000
Our File No:  3561
F:\WP51\DOC\3500\3561.TAS\INDEX.WPD

# INDEX

1.     Asset Purchase Agreement

2.     Promissory Note

3.     Assignment and Bill of Sale

4.     Closing Statement

5.     Assumption Agreement

6.     Secretary's Certificate and Directors' Resolutions

7.     Officer's Certificate

8.     Escrow Agreement

9.     Corporate and miscellaneous matters

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of January 7, 2000, between ROCK SOUND COMMUNICATIONS CORPORATION, a Delaware corporation ("Purchaser"), and  U.S. DIGITEL, INC., a Florida corporation ("Seller").

## RECITALS

A.    The Seller is a facilities based provider of telecommunications services (the "Business"); and

B.    Purchaser desires to purchase all or substantially all of the assets of Seller and the Business, and Seller is willing to sell all or substantially all of its assets and the Business to Purchaser, on the terms set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For the purposes of this Agreement, the following terms have the meanings set forth below:

**1.1**    "Acquired Assets" means all of the assets of Seller at Closing other than the Excluded Assets, including without limitation:

(a)    Generally.  Cash and cash equivalents, accounts receivable, property, equipment, inventory, goodwill, supplier lists, customer lists, resume databases of employees/contractors/subcontractors, prepaid insurance, licenses and permits, processes, service and trade marks, trade secrets, computers and computer equipment, files and other records (electronic, paper, and otherwise), systems and processes, security deposits, memberships, Material Agreements and other agreements, Leased Real Property, leasehold and other improvements, machines, machinery, equipment, furniture, fixtures, suppliers, all rights and claims under insurance policies and other contracts of whatever nature, and all causes of action, claims and demands by Seller relating to the foregoing;

1

    **(b)**    <u>Name and Related Items</u>.  The name "U.S. Digitel, Inc." and any variant thereof, all copyrights, copyright applications, trade names, trademarks, service marks and logos (whether or not registered) related thereto; Seller's transferable interest in the phone numbers and facsimile numbers listed on attached Schedule 1.1(b), and any other phone and facsimile numbers for the Business existing as of the Closing;

    **(c)**    <u>Quotations, Customer Files</u>.  All orders, bids, and quotations, with or related to past, present and prospective customers of the Business and all customer and prospect files, lists, records, studies, surveys, reports, correspondence and similar materials related to the foregoing;

    **(d)**    <u>Employee Agreements and Information</u>.  All employment , nondisclosure, noncompetition, and nonsolicitation agreements between Seller and its employees, independent contractors, and consultants, personnel files, all records relating to or information about each employee, independent contractor, and consultant, and all resumes and other information relating to prospective employees, independent contractors, and consultants (collectively, the "Employee Information");

    **(e)**    <u>Records</u>.  All books, records, lists and reports related to the Business, other than the corporate minute books, stock transfer records, and tax returns, although, the Purchaser will be provided copies of these documents;

    **(f)**    <u>Electronic Data</u>.  All rights of Seller in all electronic information and data related to the Business other than corporate minute books, stock transfer records, and tax returns; and

    **(g)**    <u>Additional Information</u>.  All sales, advertising and promotional literature and materials, advertising and advertising copy, and similar materials currently in the possession of Seller on which appear the name "U.S. Digitel," or any form thereof.

    **1.2**    "<u>Affiliate</u>" of any Person means any other Person controlling, controlled by or under common control with such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of equity securities, contract or otherwise.

    **1.3**    "<u>Applicable Law</u>" means any law, statute, treaty, rule, regulation, judgment, injunction, order, or decree, whether under or pursuant to the jurisdiction of the United States or any foreign country, or any state, municipality, or other political subdivision or authority thereof, or any commission, board, or agency to which Seller or any of its employees is subject or by which any of its properties may be bound, all to the extent that such laws are in effect prior to Closing.

412917_1 1/7/00 1:31 pm

1.4    "Assumed Liabilities" means only (i) the Liabilities directly related to the Business that are reflected on the Latest Balance Sheet and remain unpaid as of the Closing Date and (ii) the executory obligations arising after the Closing Date under the Leases listed in Schedule 4.12, the Material Agreements listed in Schedule 4.14 and the agreements that are not required to be listed on Schedule 4.14, to the extent such agreements were entered into in the ordinary course of business.

1.5    "Business" means the business presently being carried on by Seller as described in Recital A.

1.6    "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

1.7    "Closing Date" shall be the date on which the Closing (as defined in Section 3.1) occurs.

1.8    "Closing Net Working Capital" shall have the meaning set forth in Section 2.2(b).

1.9    "Code" means the Internal Revenue Code of 1986, as amended, and any reference to any particular Code section shall be interpreted to include any revision of or successor to that section regardless of how numbered or classified.

1.10   "Employment Classification Issues" means issues relating to the treatment of a worker as anything other than an employee of Seller subject to payroll tax withholding by Seller and other benefits offered to employees by Seller or, if the worker was treated as an employee of Seller, the proper classification of payments to such worker as taxable wages and the proper provision of benefits and coverage therefor.

1.11   "Environmental Lien" shall mean any Lien, whether recorded or unrecorded, in favor of any governmental entity, relating to any liability of Seller or any Subsidiary arising under any Environmental and Safety Requirements.

1.12   "Environmental and Safety Requirements" shall mean CERCLA and all other federal, state, local and foreign statutes, laws, regulations, rules, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, and pollution or protection of the environment (including, without limitation, all those relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, threatened Release, control or cleanup of any hazardous or otherwise regulated materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic

3

chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation), all to the extent that such laws are in effect prior to Closing.

    **1.13** "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

    **1.14** "Excluded Assets" means Seller's corporate charter, qualifications to do business in any jurisdiction, temporary I.D. numbers, stock certificates, stock transfer ledger, corporate minute books, tax returns and records, and similar records having to do with Seller's organization or stock capitalization; the assets of any employee benefit plan, maintained by or covering any employee of Seller or to which Seller has made any contribution; all Vehicles; any claims of Seller against any Person that are included in a pending bankruptcy or reorganization proceeding; and any personal property owned by Seller, located in the Leased Real Property and identified in Schedule 1.17.

    **1.15** "Excluded Liabilities" means, except for the Assumed Liabilities, all Liabilities of Seller, including without limitation, the following:

        (a)    Any direct or indirect Liability of Seller, whether accrued or payable before, on or after the Closing Date, directly or indirectly relating to any employee benefit plan (as such term is defined under Section 3(3) of ERISA), written or oral employment or consulting agreement, severance pay plan or agreement, employee relations policy (or practice, agreement or arrangement), agreement with respect to leased or temporary employees, vacation plan or arrangement, sick leave or pay plan, stock purchase plan, stock option plan, fringe benefit plan, incentive plan, bonus plan, deferred compensation plan (or agreement, program or arrangement) or any other employee-related plan, program, arrangement, agreement or policy which at any time (i) is or was maintained by Seller, (ii) covers any current or former employees or independent contractors of Seller (or any spouse, dependent or beneficiary of any current or former employees or independent contractors of Seller ) (iii) Seller has made (or is obligated to make) any contribution, (iv) Seller could be subject to any direct or indirect Liability or (v) health care "runoff" liabilities and claims for health care that was provided pursuant to Seller's benefit plans prior to the Closing Date;

        (b)    Any Loss arising out of Seller's failure to comply with the Bulk Transfer Act or any similar statute as enacted in any jurisdiction;

        (c)    Any Liability arising out of any breach by Seller prior to the Closing Date of any provision of any Lease, Material Agreement or other agreement assigned to Purchaser pursuant to this Agreement to which Seller is a party;

        (d)    Any Liability of Seller with respect to any Proceeding, regardless of when made or asserted, which arises out of or in connection with the Business or the Acquired Assets

4

prior to the Closing Date or with respect to any service provided or which was incurred by Seller prior to the Closing Date;

(e)     Any Liabilities of Seller relating to any Excluded Asset;

(f)     Any Liabilities of Seller relating to Taxes including, but not limited to, payroll taxes incurred in the ordinary course of business after the date of the Latest Balance Sheet and any Taxes levied on the transfer of the Acquired Assets;

(g)     Any Liability to any employee, independent contractor, or consultant of Seller, including Labor Claims as defined in Section 4.16(b), whether or not employed by Purchaser after the Closing, arising prior to the Closing, with respect to employment or consulting, or the termination of employment or consulting, or resulting from the Closing or the transactions contemplated by the Closing;

(h)     Any Liability for wages, salaries, commissions, bonuses, fringe benefits, vacation, holiday and sick pay obligations accrued through the Closing Date including any Liability relating to any Employment Classification Issues or Wage Issues, and all severance pay obligations of Seller resulting from Seller's consummation of the transactions contemplated in this Agreement;

(i)     Any obligation of Seller to indemnify any Person by reason of the fact that such Person was a director, officer, employee, agent or stockholder of Seller or was serving at the request of Seller as a partner, trustee, director, officer, employee, or agent of another entity, whether such indemnification is for judgement, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such indemnification is pursuant to any statute, charter document, bylaws, agreement, or otherwise;

1.16   "GAAP" means generally accepted accounting principles as used in the United States, applied in a consistent manner.

1.17   "General Indemnity Liabilities" shall mean the liabilities covered by Section 8.1 below other than the Unlimited Indemnity Liabilities.

1.18   "Government Authority" means any federal, foreign, state, county, or municipal (or other political subdivision) governmental department, authority, commission, board, bureau, agency or instrumentality, or legislative authority, or federal, state, or local court or other authority performing judicial or quasi judicial functions to which Seller or any of its employees is subject or having jurisdiction over it or its properties.

1.19   "Indebtedness" means at a particular time, without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt

5

security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course of business which are not more than six months past due), (iv) any commitment by which a Person assures a creditor against loss (including, without limitation, contingent reimbursement obligations with respect to letters of credit), (v) any indebtedness guaranteed in any manner by a Person (including, without limitation, guarantees in the form of an agreement to repurchase or reimburse), (vi) any obligations under capitalized leases with respect to which a Person is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which obligations a Person assures a creditor against loss, (vii) any indebtedness secured by a Lien on a Person's assets and (viii) any unsatisfied obligation for "withdrawal liability" to a "multiemployer plan" as such terms are defined under ERISA.

1.20    "Intellectual Property Rights" means all (i) patents, patent applications, patent disclosures and inventions (whether patentable or unpatentable and whether or not reduced to practice), (ii) trademarks, service marks, trade dress, trade names, logos, and corporate names, and registrations and applications for registration thereof, and Internet domain names together with all of the goodwill associated therewith, (iii) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, (iv) computer software, data, data bases and documentation thereof, (v) trade secrets and other confidential information (including, without limitation, ideas, formulas, compositions, know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial and marketing plans and customer and supplier lists and information), and (vi) all other intellectual property rights.

1.21    "Investment" as applied to any Person means (i) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, or equity securities of any other Person and (ii) any capital contribution by such Person to any other Person.

1.22    "Knowledge of Seller" means all facts and circumstances within the knowledge of the chief executive officer, chief financial officer, directors, president, vice president(s), secretary and treasurer of Seller, after reasonable inquiry.

1.23    "Latest Balance Sheet" means the November 30, 1999 unaudited balance sheet of Seller attached hereto as part of Schedule 4.6.

1.24    "Liabilities" means any direct or indirect liability, indebtedness, guaranty, claim, loss, damage, deficiency, cost, expense, fine, penalty or obligation, whether known or unknown, direct or contingent, fixed or unfixed, choate or inchoate, liquidated or unliquidated.

6

**1.25** "Lien" or "Liens" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof, or any sale of receivables with recourse against Seller, or any Affiliate).

**1.26** "Loss" or "Losses" means, with respect to any Person, any damage, liability, demand, claim, action, cause of action, cost, damage, deficiency, Tax, penalty, fine or other loss or expense, whether or not arising out of a third party claim, including all interest, penalties, reasonable attorneys' fees and expenses and all amounts paid or incurred in connection with any Proceeding by any third party or Government Authority against or affecting such Person or which, if determined adversely to such Person, would give rise to, evidence the existence of, or relate to, any other Loss and the investigation, defense or settlement of any of the foregoing.

**1.27** "Material Agreement" means any agreement, guaranty, contract, lease, understanding, or commitment, written or oral, to which Seller is a party or by which Seller or its property may be bound, which is (i) not terminable by Seller without penalty on thirty (30) days notice or less, or (ii) pursuant to which Seller incurs obligations or receives benefits of more than $5,000 per year.

**1.28** "Material Adverse Effect" means a material adverse effect on the business, operations, properties, revenues, profits or financial condition of Seller, taken as a whole.

**1.29** "Net Working Capital" means, as of a date certain, (i) the current assets of Seller as of such date (excluding any receivables aged over sixty days) minus (ii) Excluded Assets, and minus (iii) the current liabilities of Seller as of such date reflected on the balance sheet (which liabilities shall not include any long-term debt, Taxes payable or any health care "runoff" liabilities), determined in accordance with GAAP.

**1.30** "Person" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or governmental entity or any department, agency or political subdivision thereof.

**1.31** "Proceeding" means any action, claim, arbitration, suit, mediation, alternative dispute resolution proceeding, investigation, audit, examination, review, hearing, or settlement negotiation, whether instituted by or against any Government Authority or any Person.

**1.32** "Release" shall have the meaning set forth in CERCLA.

**1.33** "Securities Act" means the Securities Act of 1933, as amended, or any similar federal law then in force.

7

1.34    "Subsidiary" of any Person, means any other Person that is controlled by such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of such Person whether through the ownership of equity securities, contract, or otherwise.

1.35    "Tax" or "Taxes" means federal, state, county, city, local, foreign or other income, gross receipts, ad valorem, franchise, profits, sales or use, transfer, registration, excise, utility, environmental, communications, real or personal property, capital stock, license, payroll, wage or other withholding, employment, social security, severance, stamp, occupation, alternative or add-on minimum, estimated and other taxes of any kind whatsoever (including, without limitation, deficiencies, penalties, additions to tax, and interest attributable thereto) whether disputed or not.

1.36    "Tax Return" means any return, information report or any other filing with respect to Taxes, including any schedules attached thereto and including any amendment thereof.

1.37    "TDC" means Telecard Dispensing Corp., an affiliated entity of Seller and party to an Asset Purchase Agreement dated as of the date hereof with Purchaser.

1.38    "Transaction Documents" means, collectively, this Agreement, the USD Note the Employment Agreements for Steve Tashman, John Scafidi and David Griffee, Non-Competition Agreements to be signed by Steve Tashman, Harris Cohen and Steve Mishkin, the bills of sale transferring title to the Acquired Assets and the other documents and instruments to be executed in connection with the consummation of the transactions contemplated herein.

1.39    "Unlimited Indemnity Liabilities" shall have the meaning specified in Section 8.1(c) below.

1.40    "USD Note" means the promissory note referred to in Section 2.1 below.

1.41    "Wage Issues" means issues relating to the proper payment of minimum wage, overtime, any prevailing or actual or determined wage under the Immigration and Nationality Act, 8 U.S.C. §1101 et seq., and the Service Contract Act, as amended, 41 U.S.C. §351, et seq., and all other amounts due as wages or benefits from Seller.

## ARTICLE II
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1    **Purchase and Sale of the Acquired Assets and the Business.** Subject to the terms and conditions set forth in this Agreement, Seller shall sell to Purchaser, and Purchaser shall buy from Seller, on the Closing Date, the Acquired Assets and the Business, in exchange for the purchase price to be paid at closing as follows:  (i) $800,000.00 in immediately available funds delivered to Atlas Communications, Ltd., for and on behalf of Seller, (ii) a promissory note

8

412917_1  1/7/00 1:31 pm

Page 9, 2.2 (line 4) differs "according to GAAP"

Dated: 1/7/2000

to Seller in the form attached hereto as Exhibit A in the original principal amount of $9,200,000.00 (the "USD Note"), subject to adjustment as provided for in Section 2.2, and (iii) the assumption of the Assumed Liabilities.

**2.2    Purchase Price Adjustment.**

(a)    The Estimated Net Working Capital of Seller is <u>1 132 736</u>, based on the November 30, 1999, unaudited balance sheet of the Seller attached hereto as part of Schedule 4.6.

(b)    Within 60 days after the Closing Date, Purchaser shall cause Kaufman & Co. (the "Accounting Firm") to calculate the Net Working Capital as of the Closing Date, determined in accordance with GAAP. If the Accounting Firm determines that the Net Working Capital as of the Closing Date ("Closing Net Working Capital") differs from the Estimated Net Working Capital, then the Accounting Firm shall deliver a written notice (the "Financial Adjustment Notice") to Purchaser and Seller setting forth (i) the Accounting Firm's determination of the Closing Net Working Capital, and (ii) the amount by which the USD Note shall be increased or reduced as a result of such determination. If for any reason the Accounting Firm is unable to or declines to make the determinations called for in this section, such determinations shall be made by another accounting firm selected by Purchaser.

(c)    Within five (5) days after Seller receives the Financial Adjustment Notice, without any further agreement or action on the part of any party, the principal amount of the USD Note shall be increased (decreased), dollar for dollar, to the extent the Closing Net Working Capital exceeds (is less than) the Estimated Net Working Capital. Purchaser shall be entitled to make net adjustments and allocations between TDC and USD with respect to any post-closing adjustments provided for under this Section 2.2.

**ARTICLE III**
**CLOSING**

**3.1    Closing.** The purchase and sale of the Acquired Assets and the Business, including payment therefor and the execution and delivery of the Transaction Documents (the "Closing"), shall take place at the offices of Seller on the Closing Date, provided that all conditions to Closing have been satisfied or waived. The Closing Date shall be as of close of business on January 7, 2000.

**3.2    Deliveries.** At the Closing, Seller and Purchaser shall each deliver to the designated party or parties the documents and other items listed below, and such other mutually agreeable documents as may be reasonably required to effectuate the transactions contemplated herein:

(a)    <u>Deliveries by Seller.</u>

9

412917_1 1/7/00 1:31 pm

(i)    Bills of Sale.  Bills of sale, certificates of title, endorsements, assignments and other good and sufficient instruments of conveyance, in form and substance satisfactory to Purchaser, sufficient to sell and convey the Business and the Acquired Assets to Purchaser;

(ii)    Board Resolutions.  Certified copies of resolutions adopted by the Board of Directors and stockholders of Seller, which shall be in full force and effect at the Closing, authorizing the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby;

(iii)    Officer's Certificate.  The certificates referred to in Sections 6.1 and 6.3; and

(b)    Deliveries by the Purchaser.

(i)    Purchase Price.  The purchase price, subject to the adjustment as provided under Section 2.2, which shall be paid in the manner specified in Section 2.1;

(ii)    Assumption Agreement.  The Assumption Agreement in the form attached hereto as Exhibit B.

(iii)    Resolutions.  Certified copies of resolutions, adopted by the Board of Directors of Purchaser, which shall be in full force and effect at the time of the Closing, authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Purchaser; and

(iv)    Officers' Certificate.  The certificates referred to in Section 7.1.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

To induce Purchaser to enter into this Agreement and consummate the transactions contemplated hereby, Seller represents and warrants to Purchaser as of the date hereof, and as of the Closing Date, as follows:

**4.1    Due Organization.**  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and is duly authorized and qualified to do business as a foreign corporation and is in good standing in the jurisdictions listed on Schedule 4.1, which jurisdictions are all of the jurisdictions in which the conduct of Seller's business or the ownership of its properties require that it be qualified.  Seller has previously delivered to Purchaser true and complete copies of its Articles of Incorporation, Bylaws, minute book, and stock transfer ledger.

10

412917_1 1/7/00 1:31 pm

(g)    any sale or transfer, or any agreement to sell or transfer, any material assets, property or rights of Seller to any person, including without limitation any of its Subsidiaries or Affiliates;

(h)    any cancellation, or agreement to cancel, any indebtedness or other obligation owing to Seller, including without limitation any indebtedness or obligation of any Subsidiary, or any Affiliate thereof, provided that Seller may negotiate and adjust bills in the course of good faith disputes with customers in a manner consistent with past practice;

(i)    any plan, agreement or arrangement (i) granting any preferential rights to purchase or acquire any interest in any of the assets, property or rights of Seller or (ii) requiring the consent of any party to the transfer and assignment of any such assets, property or rights;

(j)    any purchase or acquisition of, or agreement, plan or arrangement to purchase or acquire, any property, rights or assets outside of the ordinary course of business of Seller;

(k)    any waiver of any material rights or claims of Seller;

(l)    any material breach, amendment or termination of any Material Agreement, license, permit or other right to which Seller is a party;

(m)    any transaction by Seller outside the ordinary course of business;

(n)    capital expenditure or commitment by Seller exceeding $25,000 individually or capital expenditures or commitments exceeding $100,000 in the aggregate (excluding purchases in the ordinary course of business);

(o)    change in accounting methods or practices (including any change in depreciation or amortization policies or rates) by Seller or the revaluation by Seller of any of its assets;

(p)    any creation or assumption by Seller of any Lien (other than Liens arising under existing lease financing arrangements which are not material and Liens for taxes not yet due and payable);

(q)    any entry into, amendment of, relinquishment, termination or non-renewal by Seller of any Material Agreement, except in the ordinary course of business;

(r)    loan by Seller to any person or entity, incurring by Seller of any indebtedness, guaranteeing by Seller of any indebtedness insurance or sale of any debt securities of Seller or guaranteeing of any debt securities of others;

22

412917_1  1/7/00 1:31 pm

**4.2** **Authorization; Validity.** Seller has all requisite corporate power and authority to enter into and perform its respective obligations under this Agreement. Seller's execution and delivery of this Agreement and Seller's performance of the transactions contemplated herein have been duly and validly authorized by its Board of Directors and its stockholders, if required, and any other required corporate action. This Agreement is a legal, valid and binding obligation of Seller, and is enforceable against Seller in accordance with its terms.

**4.3** **No Conflicts.** The execution, delivery and performance of this Agreement by Seller will not: (a) conflict with, or result in a breach or violation of the Articles of Incorporation or Bylaws of Seller; (b) materially conflict with, or result in a default (or would result in a default but for any requirement of notice or lapse of time or both), or require any notice, consent or approval under any Material Agreement; (c) violate, require any filing, consent or approval under, or result in the creation or imposition of any Lien on any of Seller's properties pursuant to Applicable Law; or (d) result in termination or any impairment of any material permit, license, franchise, contract right or other authorization of Seller.

**4.4** **Subsidiaries.** Seller has no Subsidiaries, and does not own, of record or beneficially, or control, directly or indirectly, any equity securities in any other Person. There has not been any sale or spin-off of any of Seller's material assets to any Affiliate within the preceding two years.

**4.5** **Predecessor Status; Etc..** Schedule 4.5 lists the names of all predecessor companies of Seller and all names if any by which Seller has previously been known. Seller has not at any time been a part of an acquisition that was later rescinded.

**4.6** **Financial Statements.** Schedule 4.6 includes copies of (i) the Latest Balance Sheet and Seller's income statement for the eleven-month period ending as of the date of the Latest Balance Sheet; (ii) the combined balance sheet, statement of income and cash flows of Seller and TDC as of December 31, 1998 (the "1998 Financial Statements"), (iii) the audited balance sheet, income statement and cash flow statement as of December 31, 1997; (items (i) through (iii) shall hereinafter collectively be referred to as the "Financial Statements"). Except as set forth in Schedule 4.6, the Financial Statements are accurate and complete, and consistent with the books and records of Seller, and the Financial Statements have been prepared in accordance with GAAP. Each of the balance sheets included in the Financial Statements presents fairly the financial condition of Seller as of the dates indicated thereon, and each of the statements of income included in the Financial Statements presents fairly the results of its operations for the periods indicated thereon.

**4.7** **Liabilities.**

(a) Seller does not have and is not subject to any Liabilities and will not have or be subject to any Liabilities on the Closing Date, except for:

11

412917_1 1/7/00 1:31 pm

(i)     Liabilities reflected on the Latest Balance Sheet;

(ii)    Liabilities disclosed on Schedule 4.7 of this Agreement.

(b)     Seller has set forth on Schedule 4.7 in the case of Liabilities that are not fixed or are contested a summary description of each Liability and an estimate of the amount that may be payable with respect to such Liability.

**4.8    Accounts and Notes Receivable.**  All of the accounts, commissions, and notes receivable reflected in the Latest Balance Sheet or included as a current asset in Net Working Capital ("Accounts Receivable") are and will be good and valid receivables, subject to no offset or counterclaim. Attached as Schedule 4.8 is a list of Seller's Accounts Receivable as of the Closing Date, which includes an aging by 30-day aging categories. Within fifteen days after Closing, Seller shall deliver to Purchaser a revised Schedule 4.8 which shall be updated as of the Closing Date. Accounts Receivable listed on Schedule 4.8 are collectable by Purchaser in the ordinary course of business within one hundred eighty (180) days from the Closing Date.

**4.9    Permits.**  Seller owns or holds all licenses, franchises, permits, motor vehicle titles, and other governmental authorizations, including those related to Environmental and Safety Requirements, the absence of any of which could have a Material Adverse Effect (the "Material Permits"). The Material Permits are valid, and Seller has not received written notice that any governmental authority intends to modify, cancel, terminate or not renew any Material Permit. Seller has conducted and is conducting its business in compliance with the Material Permits. The transactions contemplated by this Agreement will not result in a default under, or a breach or violation of, or adversely affect the rights and benefits afforded to Seller by, any Material Permit.

**4.10    Environmental and Safety Matters.**

(a)     Seller has complied with and is in compliance with all Environmental and Safety Requirements;

(b)     Seller has obtained and adhered to all Material Permits to treat, transport, store, dispose of and otherwise handle hazardous wastes and hazardous substances and has reported, to the extent required by all Environmental and Safety Requirements, all past and present sites owned and operated by Seller where hazardous wastes or hazardous substances have been treated, stored, disposed of or otherwise handled;

(c)     There have not been any Releases or threats of Releases at, from, in or on any property owned or operated by Seller, except as permitted by Environmental and Safety Requirements;

12

412917_1 1/7/00 1:31 pm

(d)      Seller knows of no on-site or off-site location to which Seller has transported or disposed of hazardous wastes and hazardous substances or arranged for the transportation of hazardous wastes and hazardous substances, which site is the subject of any federal, state, local or foreign enforcement action or any other investigation that could lead to any claim against Seller or Purchaser for any clean-up cost, remedial work, damage to natural resources or personal injury, including without limitation any claim under CERCLA, as amended; and

(e)      Seller will not have any liability in connection with any Release that occurred before the Closing Date of any hazardous waste or hazardous substance into the environment.

**4.11**    **No Material Adverse Effect**. Since November 30, 1999, there has occurred no fact, event, or circumstance which has had or could reasonably be expected to have a Material Adverse Effect. Since November 30, 1999, Seller has conducted its business only in the ordinary course of business consistent with past practice.

**4.12**    **Real and Personal Property**.

(a)      Seller has good and marketable title to, or a valid leasehold interest in, or a valid license to use, the properties and assets, tangible or intangible, used by it, located on its premises or, if applicable, shown on the Latest Balance Sheet (except for retirements, equal or better substitutions, or upgrades in the ordinary course of business) or acquired thereafter, free and clear of all Liens, except for (i) Liens for current property taxes not yet due and payable, and (ii) landlord's Liens, warehouseman's Liens and similar Liens imposed or granted in the ordinary course of business, none of which would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the properties subject to such Liens. All of Seller's buildings, equipment and other tangible assets are fit for use in the ordinary course of business to the Knowledge of Seller. Seller owns, or has a valid leasehold interest in, or a valid license to use, all the assets or rights necessary for the conduct of its businesses as presently conducted.

(b)      Schedule 4.12 lists all of the leases and subleases (the "Leases") and each leased and subleased parcel of real property in which Seller has a leasehold and subleasehold interest (the "Leased Real Property"). Seller holds a valid and existing leasehold or subleasehold interest under each Lease. With respect to each Lease listed on Schedule 4.12, to the Knowledge of Seller, there are no disputes, oral agreements, or forbearance programs in effect as to the Lease and Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the Lease. Each Lease is legal, valid, binding, enforceable and in full force and effect and will continue to be so on identical terms following the Closing; neither Seller nor, to the Knowledge of Seller, any other party to the Lease is in material breach or default, and no event has occurred which, with notice or lapse of time, would constitute such a material breach or default or permit termination, modification or acceleration under the lease or sublease; Seller has

13

not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the leasehold or subleasehold; and with respect to each sublease, the representations and warranties set forth above are true and correct with respect to the underlying lease.

(c)    Except as disclosed on Schedule 4.12, no real property is used in Seller's business, and Seller does not own any real property.

(d)    Seller is not in violation of any covenant, condition, restriction, easement, agreement, order or regulation of any governmental authority having jurisdiction over any the Leased Real Property that adversely affects such real property or the use or occupancy thereof or the health or safety of employees thereon. No damage or destruction has occurred with respect to any of the Leased Real Property that, individually or in the aggregate, has had or resulted in, or will have or result in, a Material Adverse Effect. No current use by Seller of the Leased Real Property is dependent on a nonconforming use or other approval from a governmental authority, the absence of which would limit the use of any of the properties or assets in the operation of the Business.

(e)    All of the office space occupied by Seller and, to the Knowledge of Seller, all of the buildings and all components of all buildings, structures and other improvements included within the Leased Real Property (the "Improvements"), are in good condition and repair and adequate and safe to operate such facilities as currently used.

4.13    **Significant Customers.**    Except to the extent such acts would not, in the aggregate, have a Material Adverse Effect on the Seller's financial condition or operations; (i) none of Seller's customers has canceled or substantially reduced, or given Seller oral or written notice of its intent to repudiate, revoke, terminate or cancel any agreement pursuant to which Seller provides materials or services to such customer, (ii) to the Knowledge of Seller, Seller has complied with all of its commitments and obligations and is not in default under any such agreements, (iii) no notice of default has been received with respect to any such agreements, and (iv) none of Seller's officers or account managers has received any oral or written communication that, or knows of any reason why, any customer may stop, or materially decrease the rate of, buying products or services from Seller or remove or reduce Seller's appearance on any vendor list or add any significant competitor to any vendor list on which Seller appears, whether as a result of the transaction contemplated hereby or otherwise.

4.14    **Material Agreements.**

(a)    Schedule 4.14 lists all Material Agreements, including without limitation: (i) stock option, employee stock purchase or other plans providing for deferred or other compensation to employees (but not including pension, profit sharing, medical/dental or any other employee benefit plan), or any collective bargaining agreement or any other contract with any labor union, or severance agreements, programs or policies; (ii) contracts for the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other

14

basis providing for annual compensation in excess of $100,000 or contract relating to loans to officers, directors or Affiliates; (iii) contracts under which Seller has advanced, loaned or invested or agreed to advance loan or invest monies to or in any other Person; (iv) agreements or indentures relating to borrowed money or other Indebtedness or the mortgaging, pledging or otherwise placing a Lien on any material asset or material group of assets of Seller, (v) guaranties of any obligation or any letter of credit arrangement; (vi) leases or agreements under which Seller is lessee of or holds or operates any property, real or personal, owned by any other Person; (vii) leases or agreements under which Seller is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by Seller; (viii) agreements or contracts or group of related agreements or contracts with the same party or group of affiliated parties; (ix) assignment, license, indemnification or other agreements with respect to any intangible property (including, without limitation, any Intellectual Property Rights) other than shrink-wrapped commercially available software; (x) warranty agreements with respect to its services rendered or its products sold or leased; (xi) agreements under which it has granted any Person any registration rights (including, without limitation, demand and piggyback registration rights); (xii) sales representative, sales, distribution or franchise agreement; (xiii) outstanding power of attorney or other agency agreement; (xiv) nondisclosure or confidentiality agreements; (xv) contract relating to the marketing, advertising or promotion of its services or products; (xvi) agreement with a term of more than three (3) months which is not terminable by Seller upon 30 days notice without penalty; (xvii) contract, agreement or other arrangement with any officer, director, stockholder, employee or Affiliate or any Affiliate of any officer, director, stockholder or employee, or any Affiliate of Seller; (xviii) contract or agreement prohibiting it from freely engaging in any business or competing anywhere in the world; or (xix) any other agreement which is material to its operations and business prospects or involves a consideration in excess of $100,000 annually.

(b)    Seller has given Purchaser a true and complete copy of each Material Agreement, including each amendment thereto. All of the Material Agreements are valid, legal under all Applicable Law, binding and enforceable in accordance with their respective terms, and in full force and effect. Seller has performed all obligations required to be performed by it under the Material Agreements and is not in default under or in breach of any such Agreement. Seller has not received any claim or notice of default or breach under Material Agreement; no event has occurred which with the passage of time or the giving of notice or both would result in a default by Seller under any Material Agreement. Seller has no present expectation or intention of not fully performing all of its obligations under the Material Agreements. Seller has no Knowledge of any breach or anticipated breach by the other parties to any Material Agreement.

**4.15    Insurance.** Schedule 4.15 describes each insurance policy maintained by Seller with respect to its properties, assets and businesses. Each such policy is in full force and effect as of the Closing. Seller has previously provided Purchaser with copies of the policies or policy binders. Seller is not in default with respect to its obligations under any insurance policy, and has not been denied insurance coverage. The insurance coverage of Seller is customary for

15

corporations of similar size engaged in similar lines of business. Except as set forth on the Schedule 4.15, Seller has no self-insurance programs or co-insurance programs.

**4.16    Compensation; Employment Agreements; Employees.**

(a)    Schedule 4.16 lists all officers, employees, and independent contractors and subcontractors of Seller and, for each, the method (whether salaried, hourly, or fixed price) and amount (biweekly or bimonthly salary, or hourly pay rate, or fixed price amount) of compensation, bonus (including stay bonus agreements) and other compensation arrangements with each such person as of the date hereof. Seller has provided to Purchaser accurate and complete copies of all written employment and independent contractor/subcontractor contracts, commitments and arrangements with the persons listed on Schedule 4.16.

(b)    Seller is in material compliance with all Applicable Laws relating to the employment of labor and the employer-employee relationship and with all agreements relating to the employment of its employees, including applicable wage and hour laws, equal opportunity laws, fair employment laws, safety laws, worker compensation statutes, unemployment laws, benefits laws, immigration/visa regulations (e.g., H-1B) and social security laws. No Proceedings are pending or threatened against Seller concerning: wages, compensation, bonuses, commissions, awards, benefits, or payroll deductions, wrongful termination, negligent hiring, invasion of privacy or defamation, equal employment or alleged violations regarding race, color, religion, sex, national origin, age, handicap, veteran's status, pregnancy, marital status, disability, or any other recognized class, status, or attribute under any federal, state, local or foreign equal employment law prohibiting discrimination or any other claim based on the employment relationship or termination of the employment relationship (collectively "Labor Claims"), and to the Knowledge of Seller, there is no basis for any Labor Claim against Seller. Seller is not liable, either directly or indirectly or through indemnification of any third party, for any unpaid wages, bonuses, benefits coverage or benefits, or commissions (other than those not yet due) or any tax, penalty, assessment, or forfeiture for failure to comply with any of the foregoing, or for or with respect to any Employee Classification Issue or Wage Issue. Schedule 4.16 lists all workers who are working under any visa (e.g., H-1B, L, etc.), the type and expiration date of the visa, and whether the worker is an employee of Seller or an independent contractor/subcontractor paid by Seller or any employee or independent contractor/subcontractor paid by any other Person to which Seller makes payments for that worker's services.

(c)    Seller is not bound by or subject to (and none of its respective assets or properties is bound by or subject to) any arrangement with any labor union. No employees of Seller are represented by any labor union or covered by any collective bargaining agreement and, to Knowledge of Seller, no campaign to establish such representation is in progress. There is no pending or, to the Knowledge of Seller, threatened labor dispute involving Seller and any group of its employees, nor has Seller experienced any labor interruptions over the past three years and Seller considers its relationship with its employees to be good.

16



(d)    No Person paid by Seller to perform services, whether as an employee of Seller or as an independent contractor (including as an employee or independent contractor paid by another Person that is not Seller's customer where such other Person is paid by Seller) is an employee of any customer for which the Person was providing services through Seller, and Seller has no liability to such Person, any customer or any other Person on the basis that such Person was or should have been treated by the customer as an employee of the customer.

(e)    Except as listed on the Financial Statements or on Schedule 4.16, no officer, director or employee of Seller, or any Affiliate thereof is currently a party to any contract, agreement or other arrangement with Seller, or any Subsidiary or Affiliate thereof nor has Seller made any payment to any officer, director or employee or any Affiliate thereof other than in the ordinary course of business.

### 4.17    Employee Benefit Plans.

(a)    Schedule 4.17 lists all employee benefit plans (within the meaning of Section 3(1) of ERISA), and all employee benefit programs and policies (whether formal or informal, and whether maintained for the benefit of a single individual or more than one individual) maintained or contributed to by Seller for the benefit of any current employees of Seller or any former employees of Seller that currently are or will, in the future, be entitled to payment of any benefits under the terms of any such plan, program or policy (all such plans, programs or policies being referred to as the "Benefit Plans").  Copies of all such plans and policies and all other documentation relating to such plans and policies which has been requested by Purchaser have been delivered to Purchaser.

412917_1 1/7/00 1:31 pm

(b)    Except as disclosed on Schedule 4.17:

(i)    each Benefit Plan and the administration thereof complies, and has at all times complied, in all respects with the requirements of all applicable laws, including (but in no manner limited to) ERISA, and the Code; and each Benefit Plan intended to qualify under Section 401(a) of the Code so qualifies, each trust which forms a part of any such Benefit Plan is tax-exempt under Section 501(a) of the Code; and Seller has obtained a favorable determination letter regarding the qualified status of each such Benefit Plan under the applicable provisions of the Code;

(ii)    no Benefit Plan subject to Part 3 of Title I of ERISA has incurred any "accumulated funding deficiency" (whether or not waived) within the meaning of Section 302 of ERISA or Section 412 of the Code;

(iii)    except for liability for payment of plan termination insurance premiums to the Pension Benefit Guaranty Corporation, no liability has been incurred or is expected to be incurred under Title IV of ERISA with respect to any Benefit Plan, or any other Benefit Plan presently or heretofore maintained or contributed to by Seller (or required to be contributed to), any predecessor to the Seller, or any entity that is, or at any time was a member of a controlled group, as defined in Section 412(n)(6)(B), 414(b), (c), (m), (n) or (o) of the Code, which includes or included Seller ("Controlled Group Member");

(iv)    neither Seller, nor any Shareholder nor any Controlled Group Member has incurred any liability for any tax imposed under Section 4971 through 4980B of the Code or civil liability under Section 502(c)(i) or (l), and 4071 of ERISA;

(v)    the "amount of unfunded benefit liabilities" within the meaning of Section 4001(a)(18) of ERISA does not exceed zero with respect to any Benefit Plan subject to Title IV of ERISA;

(vi)    no Benefit Plan is a multi-employer plan within the meaning of Section 3(37) of ERISA;

(vii)    no Benefit Plan provides health or death benefit coverage for any employee or independent contractor (or for any spouse, dependent or the beneficiary of any employee or independent contractor) of the Seller beyond the termination of an employee's employment (or the independent contractor's relationship) with the Seller, except as required by Part 6 of Title I of ERISA or Section 4980B of the Code; and Seller has complied with the provisions of Part 6 of Title I of ERISA and Section 4980B of the Code;

(viii)    no "reportable event" (within the meaning of Section 4043 of ERISA) has occurred with respect to any Benefit Plan or any plan maintained by a Controlled Group Member since the effective date of said Section 4043;

18

(ix)    Seller has paid all amounts due to the Pension Benefit Guaranty Corporation ("PBGC") pursuant to ERISA Section 4007;

(x)    no amendment has been made, or is reasonably expected to be made, to any Benefit Plan that has required or could require the provision of security under ERISA Section 307 or Code Section 401(a)(29);

(xi)    all contributions and premium payments to Benefit Plans that were required to be made under such Benefit Plans have been made, and all benefits accrued under any unfunded Benefit Plan will have been timely paid or accrued or otherwise adequately reserved in accordance with GAAP as of the Latest Balance Sheet and Seller will have performed by the Closing Date all material obligations required to be performed as of such date under Benefit Plans;

(xii)    there are no actions, suits or claims pending (other than routine claims for benefits) or threatened against or with respect to any Benefit Plan or the assets of any Benefit Plan, or involving any employee or non-employee worker of Seller with respect to any benefit plan maintained by any customer of Seller or by any other Person;

(xiii)    no event has occurred or circumstance exists that could result in a material increase in premium costs of any Benefit Plans that are insured, or a material increase in benefit costs of such Benefit Plans;

(xiv)    except for liabilities for the payment of benefits provided for or by any Benefit Plan, neither Seller nor any of its Controlled Group Members are subject to and no facts exist which could subject Seller or any of its Controlled Group Members to, any liability that is related to the maintenance or administration by Seller of any Benefit Plan;

(xv)    no payment that is owed or may become due to any director, officer, employee, or agent of Seller will be non-deductible to Seller or subject to tax under Code Sections 280G or 4999; nor will Seller be required to "gross up" or otherwise compensate any such person because of the imposition of any excise tax on a payment to such person; and

(xvi)    the consummation of the transactions contemplated under this Agreement will not constitute events which alone or together: (a) will entitle any current or former employee or independent contractor of Seller to receive payment of any benefit which was not otherwise payable to any such current or former employee or independent contractor of Seller; (b) will accelerate the time at which any current or former employee or independent contractor of Seller will acquire a non-forfeitable right to payment of any benefits under the terms of any Benefit Plans; or (c) will increase the amount of any benefits payable to any current or former employees of Seller under the terms of any Benefit Plans.

19

**4.18    Conformity with Law; Proceedings.** Seller is not in violation of any Applicable Law and, to the Knowledge of Seller, Seller is not a party to any Proceeding that would have a Material Adverse Effect. Except as set forth on Schedule 4.18, no Proceeding is pending or threatened against or affecting Seller, and Seller has not asserted or threatened to assert a Proceeding (i) before or by any Government Authority, or (ii) against or involving any Person. Except as set forth on Schedule 4.18, no notice of any alleged violation of Applicable Law has been received by Seller from any Government Authority. Seller has not received any opinion or memorandum or legal advice from counsel to the effect that it is exposed from a legal standpoint to any significant risk of any liability that might have a Material Adverse Effect.

**4.19    Taxes.**

(a)    Except as set forth on Schedule 4.19:

(i)    Seller has timely filed or will timely file all requisite federal, state and other Tax returns, reports and forms for all periods ended on or before the Closing Date ("Returns") and all entries on such Return are complete and accurate, and there are no material omissions from such Returns;

(ii)    there are no examinations in progress or claims against Seller for Taxes for any period or periods and no notice (oral or written) of any claim for Taxes, whether pending or threatened, has been received;

(iii)    Seller has a taxable year ended on the last day of December in each year;

(iv)    Seller currently uses the accrual method of accounting for income Tax purposes and such method of accounting has not changed in the past five years;

(v)    Seller has paid or has fully accrued for all Taxes, whenever determined, assessed or payable and whether or not shown on any Tax Return, with respect to periods ending on or before the Closing Date and the amount of taxes shown on all Returns as paid, payable or owed is accurate;

(vi)    Seller has withheld and paid all Taxes required to be withheld and paid in connection with amounts paid or owing to any employee, officer, directors, independent contractor, stockholders, creditors or any other person with respect to periods on or before the Closing Date;

(vii)    copies of (i) any Tax examinations, (ii) extensions of statutory limitations for the collection or assessment of Taxes and (iii) the Returns of Seller (excluding all federal Returns) for the last three (3) fiscal years have been delivered to Purchaser;

20

(viii)   there are (and immediately following the Closing there shall be) no Liens on the assets of Seller relating to or attributable to any Tax except for property taxes not yet due and payable, to the extent reflected on the Latest Balance Sheet;

(ix)   There is no basis for the assertion of any claim relating to or attributable to any Tax and there has never been a claim made by any authority in a jurisdiction where Seller does not file Tax Returns or pay tax that Seller is or may be subject to tax in such jurisdiction;

(x)   Seller has not waived any statute of limitations in respect of any Tax or agreed to any extension of time with respect to a Tax assessment or deficiency for any taxable period; and

(xi)   Seller has no liability for the Taxes of any Person other than Seller (A) under Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign law), (B) as a transferee or successor, (C) by contract, or (D) otherwise.

**4.20    Absence of Changes.**  Since the date of the Latest Balance Sheet, except for the consummation of the transactions contemplated hereby or as set forth on Schedule 4.20, there has not been:

(a)    any event that by itself or together with other events, has, had or will have a Material Adverse Effect;

(b)    any damage, destruction or loss (whether or not covered by insurance) that had or has a Material Adverse Effect;

(c)    any change in the authorized capital of Seller or in the issuance or ownership of its equity securities;

(d)    any declaration or payment of any dividend or distribution in respect of the common stock or any direct or indirect redemption, purchase or other acquisition of any of the common stock;

(e)    any increase in the compensation, bonus, sales commissions or fee arrangement payable or to become payable by Seller to any of its officers, directors, the stockholders, employees, consultants or agents other than in the ordinary course of business in amounts consistent with past practices;

(f)    any work interruptions, labor grievances or claims filed, or any similar event or condition of any character that has or had a Material Adverse Effect;

21

(s)    the commencement or notice or, to the Knowledge of Seller, threat of commencement of any Proceeding against or involving Seller relating to, or affecting, Seller; or

(t)    negotiation or agreement by Seller or any officer or employee thereof to do any of the things described in the preceding clauses (a) through (s) (other than negotiations with Purchaser and its representatives regarding the transactions contemplated in this Agreement).

**4.21    Bank Accounts; Powers of Attorney.** Schedule 4.21 lists: (a) the name of each financial institution where an account, certificate of deposit or safe deposit box is maintained by Seller or its Affiliates; (b) the names in which the accounts or boxes are held; (c) the type of account; and (d) the Persons authorized to direct or execute deposits or withdrawals from such accounts. Schedule 4.21 also sets forth the name of each Person holding a general or special power of attorney from Seller and a description of the terms of such power.

**4.22    Relations with Governments.** Seller has not made, offered ,or agreed to offer anything of value to any governmental official, political party or candidate for government office, nor has it otherwise taken any action that would cause Seller to be in violation of the Foreign Corrupt Practices Act of 1977, as amended, or any law of similar effect.

**4.23    FCC Compliance.**

(a)    Except as set forth in Schedule 4.23, Seller has in effect all the licenses required to be obtained from the FCC ("FCC Licenses") and any applicable state public utility commission exercising jurisdiction exercising jurisdiction over Seller ("Applicable PUC") for the conduct of its business. All FCC licenses and any Applicable PUC licenses which are held by Seller were duly and validly issued and are in full force and effect; and Seller is not in violation of any of the terms and conditions of any of the FCC Licenses or any applicable PUC licenses in a manner. Seller has fulfilled and performed all of its obligations with respect to its FCC Licenses and any Applicable PUC licenses, and no event has occurred which allows, or after notice or lapse of time would allow, revocation or termination thereof or result in any other impairment of Seller's rights under any of its FCC Licenses or any Applicable PUC licenses.

(b)    Seller is not in violation of the Communications Act of 1934, as amended, or any rule or regulation of the FCC or any Applicable PUC, or any judgment, injunction, order, or decree of the FCC or any Applicable PUC. Seller has in effect with the FCC and all Applicable PUCs all international and domestic service tariffs necessary to conduct its business.

(c)    There is no outstanding adverse judgment, injunction, decree or order that has been issued by the FCC or any Applicable PUC against the Seller, or any action, proceeding, or investigation pending or threatened by the FCC or any applicable PUC against Seller, specifically including (but not limited to) any pending or threatened proceeding that would have the effect of revoking or restricting any of the FCC Licenses or any Applicable PUC licenses.

23

412917_1 1/7/00 1:31 pm

(d)    Except as set forth on Schedule 4.23, the execution, delivery and performance by Seller of this Agreement, compliance by Seller with the provisions hereof and the consummation by Seller of the transactions contemplated hereby will not require that the Company obtain any consent, approval, authorization or other order of the FCC or any Applicable PUC, violate or conflict with the Communications Act of 1934, as amended, or the rules or regulations of the FCC or any Applicable PUC, and will not cause any cancellation, termination, revocation, forfeiture or impairment of any of the FCC Licenses or any Applicable PUC licenses.

(e)    Seller is in compliance in the provision of international call-back service with the laws of all foreign jurisdictions that would constitute a violation of the FCC Licenses.

**4.24    Complete Copies of Materials.**  Except as disclosed in this Agreement or in the Schedules, Seller has delivered to Purchaser true and complete copies of each Material Agreement, lease, commitment or other document (or summaries of same) that is referred to in the Schedules.

**4.25    Intellectual Property Rights.**

(a)    Seller owns or has the right to use pursuant to license, sublicense, agreement, or permission all Intellectual Property Rights necessary or used in the ordinary course of business for the operation of the Business as presently conducted and as presently proposed by Seller to be conducted.  Subject to the receipt of any required consents to assignment, each item of Intellectual Property owned or used by Seller immediately prior to the Closing hereunder will be owned or available for use by Purchaser on identical terms and conditions immediately subsequent to the Closing.  Seller has take all commercially reasonable and necessary action to maintain and protect each item of Intellectual Property that it owns or uses.

(b)    Seller has not interfered with, infringed upon, misappropriated, or otherwise misused any Intellectual Property Rights of any Person, and Seller has not ever received, nor is there any basis for, any claim alleging any such interference, infringement, misappropriation, or violation (including any claim that Seller must license or refrain from using any Intellectual Property Rights of any Person).  No Person has interfered with, infringed upon, misappropriated, or otherwise misused any Intellectual Property Rights of Seller.

(c)    Schedule 4.25(c) identifies each patent or registration which has been issued to Seller with respect to any of its Intellectual Property Rights, identifies each pending patent application or application for registration which Seller has made with respect to any of its Intellectual Property Rights, and identifies each license, agreement, or other permission which Seller has granted to any third party with respect to any of its Intellectual Property Rights (together with any exceptions).  Seller has delivered to Purchaser correct and complete copies of all such patents, registrations, applications, licenses, agreements, and permissions (as amended to date) and has made available to Purchaser correct and complete copies of all other written

24

documentation evidencing ownership and prosecution (if applicable) of each such item. Schedule 4.25(c) also identifies each trade name or unregistered trademark used by Seller in connection with its business and any address at which each name or mark was used. With respect to each item of Intellectual Property Rights required to be identified in Section 4.25: (i) Seller possesses all right, title, and interest in and to the item, free and clear of any Lien; (ii) the item is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge; (iii) no Proceeding is pending or is threatened which challenges the legality, validity, enforceability, use, or ownership of the item; and (d) Seller has never agreed to indemnify any person for or against any interference, infringement, misappropriation, or other conflict with respect to the item.

(d)     Schedule 4.25(d) identifies each item of Intellectual Property Rights that Seller uses pursuant to license, sublicense, agreement, or permission. Seller has delivered to Purchaser correct and complete copies of any such licenses, sublicenses, agreements, and permissions (as amended to date). With respect to each item of Intellectual Property required to be identified in Scheduled 4.25(d): (i) the license, sublicense, agreement, or permission covering the item is legal, valid, binding, enforceable, and in full force and effect; (ii) subject to required consents to assignments, the license, sublicense, agreement, or permission will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated by this Agreement; (iii) no party to the license, sublicense, agreement, or permission is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default or permit termination, modification, or acceleration thereunder; (iv) no party to the license, sublicense, agreement, or permission has repudiated any provision thereof; (v) with respect to each sublicense, the representations and warranties set forth in subsections (i) through (iv) above are true and complete with respect to the underlying license; (f) the underlying item of Intellectual Property Rights is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge; (g) no Proceeding is pending or is threatened which challenges the legality, validity, or enforceability of the underlying item of Intellectual Property Rights; and (h) Seller has not granted any sublicense or similar right with respect to the license, sublicense, agreement, or permission.

(e)     Except for required consents to assignments by third parties, Purchaser will not interfere with, infringe upon, misappropriate, or misuse, any Intellectual Property Rights of third parties as a result of the continued operation of Seller's business as presently conducted and as presently proposed by the company to the conducted.

(f)     Seller's information systems are designed to be used prior to, during, and after the year 2000, and given valid date input in four digit format, all the software shall provide valid and correct results as regards date data in all date calculations, and will not abort or cause an abnormally ending scenario as a result of performing date calculations involving years after 1999.

25

412917_1  1/7/00 1:31 pm

**4.26    Product and Service Warranty.** To the Knowledge of Seller, the services provided by Seller conform in all material respects with all applicable contractual commitments and all express and implied warranties. Seller has no material liability, individually or in the aggregate (and there is no basis for any present or future Proceeding giving rise to any such liability) in connection therewith, subject only to the reserves set forth, if any, in the Latest Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Seller. No service provided by Seller is subject to any guaranty, warranty, or other indemnity beyond the standard terms and conditions. Seller has provided to Purchaser a copy of the standard terms and conditions for each of Seller's agreements containing applicable guaranty, warranty, and indemnity provisions.

**4.27    Product Liability.** Seller has never manufactured, sold, leased, or delivered any products to a third party.

**4.28    Litigation and Other Proceedings.** Other than as listed in Schedule 4.28 or as set froth on Schedule 4.18, there is no claim, counterclaim, suit, order, proceeding, action or investigation pending, notice of which has been received by or threatened against Seller. Seller is not plaintiff or petitioner in any pending litigation or proceeding other than as listed in Schedule 4.28. Seller is not and has never been the subject of a petition for reorganization or liquidation under the federal or state bankruptcy or insolvency laws, nor has it made any assignment for the benefit of creditors or applied for any similar protective proceeding or act or event of bankruptcy.

**ARTICLE V**
**REPRESENTATIONS OF PURCHASER**

To induce Seller to enter into this Agreement and consummate the transactions contemplated hereby, Purchaser represents and warrants to Seller, as of the date hereof, and as of the Closing Date, as follows:

**5.1    Due Organization.** Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Delaware, and it is duly authorized and qualified to do business in the places and in the manner as now conducted, except where the failure to be so authorized or qualified would not have a Material Adverse Effect.

**5.2    Authorization; Validity of Obligations.** Purchaser has the right, power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement by Purchaser has been duly authorized by all necessary corporate action. This Agreement is a legal, valid and binding obligation of Purchaser enforceable in accordance with its terms.

412917_1  1/7/00 1:31 pm

**5.3**     **No Conflicts.**  The execution, delivery and performance of this Agreement by Purchaser will not: (a) conflict with, or result in a breach or violation of Purchaser's Articles of Incorporation or Bylaws; (b) materially conflict with, or result in a material default (or would constitute a default but for any requirement of notice or lapse of time or both), or require any notice, consent or approval under any agreement to which Purchaser is a party or is otherwise subject; (c) violate, require any filing, consent or approval under, or result in the creation or imposition of any Lien on any of Purchaser's properties pursuant to Applicable Law; or (d) result in termination or any impairment of any material permit, license, franchise, contractual right or other authorization of Purchaser.

**5.4**     **Proceedings.**  There are no material Proceedings, pending or, to the best knowledge of Purchaser, threatened, against or affecting Purchaser the determination of which would have an adverse effect on this Agreement.

## ARTICLE VI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligation of Purchaser to effect the transactions contemplated by this Agreement is subject to the satisfaction or waiver by Purchaser, at or before the Closing, of the following conditions:

**6.1**     **Representations and Warranties; Performance of Obligations.**  All of the representations and warranties of Seller shall be true, correct and complete on the date hereof and on the Closing Date.  All of the terms, covenants, agreements and conditions of this Agreement to be complied with, performed or satisfied by Seller on or before the Closing shall have been duly complied with, performed or satisfied. Purchaser shall have received a certificate dated the Closing Date and signed by Seller to the foregoing effects.

**6.2**     **No Litigation.**  No Proceeding before a Government Authority shall have been instituted or threatened to restrain or prohibit (i) the transactions contemplated by this Agreement, or (ii) Purchaser's acquisition of the Acquired Assets and the Business, and no Government Authority shall have taken any other action or made any request of Purchaser that causes Purchaser's management to conclude, in its reasonable discretion, that it is inadvisable to proceed with the transactions hereunder.

**6.3**     **No Material Adverse Change.**  No change in the business, operations, affairs, prospects, properties, assets, existing and potential liabilities, obligations, profits or condition (financial or otherwise) of Seller, shall have occurred since November 30, 1999, which, taken as a whole had or will have a Material Adverse Effect; and Purchaser shall have received a certificate dated the Closing Date and signed by Seller to such effect.

## ARTICLE VII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

412917_1 1/7/00 1:31 pm

The obligation of Seller to effect the transactions contemplated by this Agreement is subject to the satisfaction or waiver by Seller, at or before the Closing, of the following conditions:

**7.1    Representations and Warranties; Performance of Obligations.**  All of the representations and warranties of Purchaser shall be true, correct and complete on the date hereof and on the Closing Date.  All of the terms, covenants, agreements and conditions of this Agreement to be complied with, performed or satisfied by Purchaser on or before the Closing shall have been duly complied with, performed or satisfied.  Seller shall have received certificates dated the Closing Date and signed by Purchaser to the foregoing effects.

**7.2    No Litigation.**  No Proceeding before a Government Authority shall have been instituted or threatened to restrain or prohibit (i) the transactions contemplated by this Agreement, (ii) Purchaser's acquisition of the Acquired Assets and the Business, or (iii) fulfillment of Purchaser's obligations hereunder, and no Government Authority shall have taken any other action or made any request of Seller that causes Seller's management to conclude, in its reasonable discretion, that it is inadvisable to proceed with the transactions hereunder.

**7.3    Assignment of Lease Agreements.**  Purchaser and Seller shall have entered into mutually acceptable assignments of the leases for the spaces currently occupied by Seller.

**ARTICLE VIII**
**INDEMNIFICATION**

**8.1    Indemnification by the Seller.**  Seller covenants and agrees to indemnify, defend, protect and hold harmless Purchaser and each of Purchaser's officers, directors, employees, stockholders, assigns, representatives, agents, successors and affiliates, (individually, each a "Purchaser Indemnified Party" and collectively, the "Purchaser Indemnified Parties") from, against, and in respect of:

(a)    all Liabilities, Losses, and Proceedings, (including without limitation reasonable attorneys' fees and expenses) (collectively, "Claims") suffered, sustained, incurred or paid by Purchaser Indemnified Parties in connection with, resulting from or arising out of:

(i)    any breach of any representation or warranty of Seller set forth in this Agreement, or any Transaction Document, or any certificate or other writing delivered by Seller in connection herewith;

(ii)    any nonfulfillment of any covenant or agreement on the part of Seller set forth in this Agreement;

28

412917_1 1/7/00 1:31 pm

     (iii) the business, operations or assets of Seller on or before the Closing Date, or the actions or omissions of Seller's directors, officers, stockholders, employees or agents on or before the Closing Date, including, without limitation,

        (A) any Liabilities of Seller other than the Assumed Liabilities;

        (B) Claims for Taxes or any Claims arising out of any Return filed on behalf of Seller, or Claims arising with respect to any Benefits Plan which is sponsored by Seller (including, without limitation, all claims for health care that was provided pursuant to Seller's Benefits Plan prior to the Closing Date);

        (C) Claims arising from Employment Classification Issues or Wage Issues or Labor Claims; and

        (D) Claims arising under or in connection with any Benefits Plan;

    (b) any and all claims incident to any of the foregoing or to the enforcement of this Section 8.1;

    (c) Notwithstanding the terms of Sections 8.1(a) and (b), there shall be no indemnification under Section 8.1 unless, and solely to the extent that, the aggregate amount of Claims exceeds $25,000 (the "Indemnification Threshold"); provided, however, that the Indemnification Threshold shall not apply to following ("Unlimited Indemnity Liabilities"): (i) adjustments to the Purchase Price set forth in Section 2.2; (ii) Claims arising out of any breaches of the covenants set forth in this Agreement or the representations made in Sections 4.1 through 4.5, 4.10, 4.16, 4.17 and 4.19; (iii) Claims described in 8.1(a)(iii)(B), (C) and (D); or (iv) Claims based on fraud (claims in (ii), (iii) and (iv) shall hereinafter be referred to as "Surviving Claims"). Except for Surviving Claims, the aggregate amount of Seller's liability under this Section 8 shall not exceed the Purchase Price, however, that Seller's liability for Unlimited Indemnity Liabilities shall not be subject to such limitation.

    (d) No Claim shall be deemed to have been sustained by a Purchaser Indemnified Party under this Section 8.1 to the extent of insurance proceeds paid to such Purchaser Indemnified Party as a result of the event giving rise to the right of indemnification.

**8.2 Survival.**

    (a) The representations and warranties given or made by Seller in this Agreement or in any certificate or other writing furnished in connection herewith shall survive the Closing until the third anniversary of the Closing Date and shall thereafter terminate and be

29

412917_1 1/7/00 1:31 pm

of no further force or effect, except that (a) all representations and warranties relating to Environmental and Safety Matters (Section 4.10 ), Compensation, etc. (Section 4.16), Benefit Plans (Section 4.17) and Taxes (Section 4.19) shall survive the Closing for the period of the applicable statutes of limitation plus any extensions or waivers thereof, (b) all representations and warranties set forth in Sections 4.1 through 4.5 and any claim for indemnification made pursuant to Section 8.1(a)(iii)(B), (C) and (D) shall survive the Closing for the period of the applicable statute of limitations, and (c) any representation or warranty as to which a Claim (including without limitation a contingent claim) shall have been asserted during the survival period shall continue in effect with respect to such Claim until such Claim shall have been finally resolved or settled. Each party shall be entitled to rely upon the representations and warranties of the other party or parties set forth herein regardless of any investigation or audit conducted before or after the Closing Date or the decision of any party to complete the Closing.

(b)     The representations and warranties given or made by Purchaser in this Agreement or in any certificate or other writing furnished in connection herewith shall survive the Closing until the third anniversary of the Closing Date and shall thereafter terminate and be of no further force or effect.

**8.3     Indemnification by Purchaser.**  Purchaser covenants and agrees to indemnify, defend and, protect and hold harmless Seller and each of its officers, directors, employees, stockholders, assigns, representatives, agents, successors and affiliates (individually a "Seller Indemnified Party" and collectively "Seller Indemnified Parties") from, against and in respect of all Claims suffered, sustained, incurred or paid by the Seller or its stockholders in connection with, resulting from or arising out of (i) any breach of any representation or warranty of Purchaser set forth in this Agreement, or any Transaction Document or any certificate or other writing delivered by Purchaser in connection herewith; and (ii) any nonfulfillment of any covenant or agreement on the part of Purchaser set forth in this Agreement.

**8.4     Indemnification Procedure.**  All claims for indemnification under Sections 8.1 and 8.3 shall be asserted and resolved as follows:

(a)     If any Claim for which Seller pursuant to Section 8.1 or Purchaser pursuant to Section 8.3 (the "Indemnifying Party") would be liable to any Purchaser Indemnified Party or Seller Indemnified Party (collectively or individually an "Indemnified Party" and the "Indemnified Parties") is asserted against an Indemnified Party by a third party, the Indemnified Party shall promptly notify the Indemnifying Party of such Claim (the "Claim Notice"), specifying the nature of such Claim and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such Claim). The failure of an Indemnified Party to give a Claim Notice promptly shall not invalidate the indemnification provided for hereunder, but the amount of any indemnification liability may be reduced to the extent that an Indemnifying Party can demonstrate that such failure actually and materially impeded the defense of such Claim. The Indemnifying Party shall have thirty (30) days from the receipt of the Claim Notice (the "Notice Period") to notify the Indemnified Party

30

(i) whether or not the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Claim and (ii) if the Indemnifying Party does not dispute such liability, to confirm that it is prepared at its expense to defend against such Claim, provided that the Indemnified Party is hereby authorized (but not obligated) before and during the Notice Period to file any motion, answer or other pleading and to take any other action that the Indemnified Party shall deem necessary or appropriate to protect the Indemnified Party's interests.  If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party does not dispute its obligation to indemnify hereunder and confirms that it will at its expense defend the Indemnified Party against such Claim, the Indemnifying Party shall have the right to defend against such Claim and shall prosecute such defense to a final conclusion either by judgment or settlement. The Indemnified Party shall have a reasonable right to approve of counsel selected by the Indemnifying Party.  The Indemnifying Party shall keep the Indemnified Party reasonably informed of the defense against the Claim and of any settlement discussions so that the Indemnified Party may be assured that its interests are being protected.  Unless the Indemnified Party otherwise agrees in writing, the Indemnifying Party may not settle any Claim (in whole or in part) unless such settlement includes a complete and unconditional release of the Indemnified Party and/or a dismissal with prejudice from any related Proceeding.  The Indemnified Party may participate in, but not control, any such defense or settlement at its expense.  If the Indemnifying Party disputes its liability to the Indemnified Party, or fails to give timely notice during the Notice Period, or fails to assume the defense against such Claim, or having assumed such defense fails to prosecute it so as to protect the interests of the Indemnified Party, then the Indemnified Party, without waiving any rights against the Indemnifying Party, may settle or defend against any such Claim in the Indemnified Party's sole discretion and, if it is ultimately determined that the Indemnifying Party is responsible therefor under this Section 8, then the Indemnified Party shall be entitled to recover from the Indemnifying Party the amount of any settlement or judgment and all indemnifiable costs and expenses of the Indemnified Party with respect thereto, including interest at six percent per annum from the date such costs and expenses were incurred.

(b)     If at any time a Claim seeks prospective relief that could have a Materially Adverse Effect on the Indemnified Party, or any of its Affiliates or Subsidiaries, or if any position asserted by the Indemnifying Party or any settlement proposed by or to the Indemnifying Party would require or result in a change in the future operations or practices of the Indemnified Party or any of its Affiliates or Subsidiaries, the Indemnifying Party shall notify the Indemnified Party. Thereafter the Indemnified Party shall have the right to control or assume (as the case may be) the defense (at the Indemnifying Party's expense) of any such Claim and the amount of any judgment or settlement shall be part of the indemnification obligations of the Indemnifying Party hereunder; provided, however, that the Indemnifying Party must approve the amount of any settlement, such approval not to be unreasonably withheld; and provided further that if the Indemnified Party does not assume control but instead leaves the Indemnifying Party to defend the Claim, then no such position or settlement shall be asserted or proposed or agreed to without the approval of Purchasers in their sole discretion.  If the Indemnified Party should elect to exercise such right to control or assume the defense, the Indemnifying Party shall have the right

31

to participate in, but not control, the defense of such claim or demand at the expense of the Indemnifying Party.

(c)    If the Indemnified Party has a Claim against the Indemnifying Party that does not involve a Claim being asserted by or against a third party, the Indemnified Party shall promptly send a Claim Notice with respect to such Claim to the Indemnifying Party. The Indemnifying Party shall within the Notice Period either accept liability for the Claim, in whole or in part, or deny such liability. Unless the Indemnifying Party accepts liability for the entire Claim, the parties shall attempt in good faith to resolve any dispute between them, failing which the Indemnified Party shall institute such Proceedings as are appropriate. If the Indemnifying Party does not notify the Indemnified Party within the Notice Period that the Indemnifying Party disputes such Claim, the Indemnifying Party shall be deemed conclusively to have accepted liability for the Claim for the amount stated in the Claim Notice.

(d)    An Indemnified Party may assert a potential or contingent Claim, in which case the Claim Notice shall set forth the specific basis for such Claim to the extent then feasible. The Indemnified Party's failure to give reasonably prompt notice to the Indemnifying Party of any actual, threatened or possible claim or demand which may give rise to a right of indemnification hereunder shall not relieve the Indemnifying Party of any liability that the Indemnifying Party may have to the Indemnified Party, unless the failure to give such notice materially and adversely prejudiced the Indemnifying Party. The procedures set forth in this Section 8 shall not apply to claims or demands of Purchaser which in the reasonable opinion of Purchaser may be covered by the Indemnification Threshold.

**8.5    Indemnification Payments; Adjustments.** If and to the extent the application of this Section 8 results in an obligation on the part of an Indemnifying Party to make payment to an Indemnified Party, such payment shall be made promptly, in cash, and shall bear interest at six percent (6%) per annum from the date on which such payment became due (either as a result of an agreement between the parties or a final outcome in a Proceeding). All payments due to Purchaser Indemnified Parties from Seller Indemnifying Parties may be satisfied, at Purchaser's discretion, by offsetting such payments against any amounts due to Seller.

## ARTICLE IX
## COLLECTION OF ACCOUNTS RECEIVABLE

Purchaser shall use its commercially reasonable efforts to collect the Accounts Receivable other than notes receivable in accordance with normal trade practices applicable to its customers, but shall not be required to initiate suit, file proofs of claim in bankruptcy, resolve claims of offset for any reason whatsoever, or undertake any other collection activity outside the normal course of Purchaser's business. However, Purchaser shall not compromise or write off any of the Accounts Receivable that it wishes to reassign to Seller hereunder. With respect to bona fide disputes, payments in exchange for lien waivers, and payments on bonded projects, as between Purchaser and Seller, payments shall be credited in accordance the account debtor's

32

instructions, but Purchaser shall still use its commercially reasonable efforts to collect or resolve the Accounts Receivable with respect to which there are bona fide disputes. If and to the extent that the Accounts Receivable other than notes receivable are not collected by Purchaser within one hundred and eighty days after the date of Closing, Purchaser shall be entitled to reassign any or all of the uncollected Accounts Receivable other than notes receivable within a period of thirty days (i.e., within two hundred ten days after the Closing) to Seller, and, at Purchaser's discretion, either (i) Seller shall promptly pay Purchaser an amount equal to the aggregate balance of the reassigned and uncollected Accounts Receivable, or (ii) Purchaser may offset such amount against any amounts due to Seller. Upon reassignment, Seller agrees that Seller will attempt to resolve any dispute through mediation or other alternative dispute resolution means (if the account debtor is willing to do so) before pursuing litigation with respect to the reassigned Accounts Receivable. On any reassigned Accounts Receivable, Purchaser will cooperate fully with Seller in any reasonable request, and to obtain from Purchaser the assistance, testimony, and personal efforts of Purchaser's sales personnel or other employees with personal knowledge of the account debtor or sales transactions out of which the subject Accounts Receivable arose.

## ARTICLE X
## OTHER AGREEMENTS

10.1    **Seller Non-Disclosure.** Seller acknowledges having access to certain information of Purchaser that constitutes valuable, special and unique assets of Purchaser. Seller agrees not to disclose any information relating to Purchaser that is not publicly known (the "Purchaser Confidential Information") to any Person for any reason (except as reasonably required in the negotiation, execution, and delivery of this Agreement) unless (a) Purchaser consents in writing to the disclosure of such Purchaser Confidential Information, (b) such Purchaser Confidential Information becomes known to the public generally through no fault of the Seller, (c) such Purchaser Confidential Information is disclosed to another Person without restriction of confidentiality, or (d) disclosure is required by Applicable Law or pursuant to formal process in a Proceeding. If Seller discloses or threatens to disclose Purchaser Confidential Information in breach of this Section 10.1, Purchaser shall be entitled to an injunction restraining the Seller from disclosing such Purchaser Confidential Information as well as to any other available remedy for such breach or threatened breach, including the recovery of damages.

10.2    **Purchaser Non-Disclosure.** Purchaser acknowledges having access to certain information of Seller, such as lists of customers, bill rates and direct labor rates (and profit margins) relating to individual customers and workers, skill set demands and availabilities, operational policies and pricing, and cost policies that are valuable, special and unique assets of Seller and which will be the property of Purchaser upon Closing. Prior to Closing, or at any time if this Agreement terminates without Closing, Purchaser agrees not to disclose any information relating to Seller that is not publicly known (the "Seller Confidential Information") to any Person for any reason (except as reasonably required in the negotiation, execution, and delivery of this Agreement) unless (a) Seller consents in writing to the disclosure of such Seller Confidential Information, (b) such Seller Confidential Information becomes known to the public generally

33

Regarding USD, page 34, paragraph 10.5 (line 1) "non-withstanding the provision of section 10.3," upon.....

Dated: 1 | 7 | 2000

through no fault of Purchaser, (c) such Seller Confidential Information is disclosed to another Person without restriction of confidentiality, or (d) disclosure is required by Applicable Law or pursuant to formal process in a Proceeding. If Purchaser discloses or threatens to disclose Seller Confidential Information in breach of this Section 10.2, Seller shall be entitled to an injunction restraining Purchaser from disclosing such Seller Confidential Information as well as to any other available remedy for such breach or threatened breach, including the recovery of damages.

**10.3    Agreement of Shareholders.** Marilyn Tashman, Harris Cohen, Steve Mishkin, Ernie Lockamey, David Griffee and Joan Casasanta (the "Shareholders") hereby covenant that with respect to any corporate action of Seller necessary to approve the transactions contemplated by this Agreement, that each of them shall vote in favor of the transactions contemplated hereby. Each Shareholder hereby executes and delivers a copy of this Agreement solely to indicate such Shareholder's agreement to vote in favor of the transactions contemplated by this Agreement, and for no other reason.

**10.4    Non-Competition.** Notwithstanding the provisions of Section 10.3 Seller and Steve Tashman ("Tashman") acknowledges that Seller has transferred all of its rights to the Acquired Assets and the Business to Purchaser hereunder and, in connection therewith, covenant and agree that, until the third anniversary of the Closing Date, none of Seller, Tashman or any of their affiliates, successors or assigns will, without the prior written consent of Purchaser, (a) directly or indirectly engage in a business which competes, directly or indirectly, with the Business in the State of Florida,, whether as an owner, consultant, manager, partner, independent contractor, agent or otherwise or by means of any corporate or other device; (b) solicit orders, directly or indirectly, for themselves or on behalf of any Person other than Purchaser, from any customer, client or account located in the State of Florida for any prepaid calling card product or service; or (c) refer or cause to be referred any of the Business accounts to any Person engaged in the Business other than Purchaser. Tashman executes and delivers a copy of this Agreement solely to indicate his agreement with this Section 10.4

**10.5    Mishkin and Cohen Non-Compete Agreements.** Upon receipt of the first scheduled payment by Telecard Dispensing Corp. ("TDC") of any amount due under the TDC Note (as such term is deferred in the Asset Purchase Agreement dated as of the date hereof between TDC and Purchaser), Steve Mishkin and Harris Cohen each covenant and agree to execute and deliver to Purchase an non-compete agreement in substance substantially similar to the provisions set forth in Section 10.4.

**10.6    Settlement of FTC Action.** Seller covenants and agrees to settle and dismiss or cause to be settled and dismissed all claims and related actions arising or related to the facts or circumstances giving rise to the pending action styled Federal Trade Commission v. Telecard Dispensing Corporation, et. al., Case No. 98-7058-CIV-RYSKAMP, now pending in the United States District Court, Southern District of Florida.

**10.7    Lease Assignment.** To the extent not provided on the Closing Date, Seller shall

412917_1 1/7/00 1:31 pm

use its best efforts to obtain the landlord's consent to the assignment of the lease, or a sublease, to Purchaser of the office space located at 1909 Tyler Street, Hollywood, Florida 33020, and agrees, that, until such assignment or sublease is obtained, Seller shall provide the Purchaser with the same benefits as if such landlord's consent was obtained.

**ARTICLE XI**
**TERMINATION**

**11.1**    The parties may terminate this Agreement at any time by mutual agreement.

**11.2**    Purchaser may terminate this Agreement at any time if

      (a)    Seller breaches any representation, warranty, or covenant set forth in this Agreement;

      (b)    there is discovered or there occurs an event or circumstance that could have a Material Adverse Effect; or

      (c)    a Government Authority initiates or threatens to initiate a Proceeding seeking directly or indirectly to declare this Agreement to be illegal, or to prohibit the consummation of the transactions contemplated by this Agreement, or to condition the Closing on actions or restrictions that in the reasonable judgement of Purchaser make it inadvisable to proceed.

**ARTICLE XIII**
**MISCELLANEOUS**

**13.1    Further Assurances.** If at any time after the Closing Date Buyer shall consider or be advised that any further deeds, assignments or assurances in law or any other acts are necessary, desirable or proper to (i) vest, perfect or confirm, of record or otherwise, in Buyer, the title to the Purchased Assets, or (ii) otherwise carry out the purposes of this Agreement, Seller shall execute and deliver all such deeds, assignments and assurances in law and do all acts reasonably necessary, desirable or proper to vest, perfect and confirm title to such Purchased Assets in Buyer, and otherwise to carry out the purposes of this Agreement and the transactions contemplated hereby.

**13.2    Successors and Assigns.** This Agreement and the rights of the parties hereunder may be assigned and shall be binding upon and inure to the benefit of the parties hereto, and the successors of Purchaser and Seller.

**13.3    Entire Agreement.** This Agreement and the Transaction Documents set forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby. It shall not be amended or modified except in writing executed by each of the parties hereto

35

412917_1 1/7/00 1:31 pm

specifically stating that it is an amendment or modification of this Agreement. All previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral and including the Letter of Intent, are superseded by this Agreement.

13.4    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when all counterparts taken together shall have been executed and delivered (which deliveries may be by fax) by the parties.

13.5    **Brokers and Agents.** Purchaser and Seller represent and warrant to the other that it has not employed any broker or agent in connection with the transactions contemplated by this Agreement. Seller and Purchaser each shall pay any fees owing to their respective broker, provided, however, that Seller's Broker shall be paid prior to or such fees shall be included in liabilities and reflected in the calculation of Net Working Capital Calculation. Each of Purchaser and Seller shall indemnify and hold each other harmless against a failure to pay its respective broker, or a breach of the representations and warranties contained in this Section 14.5.

13.6    **Expenses.** Purchaser has paid and will pay the fees, expenses and disbursements of Purchaser and its agents, representatives, accountants and counsel incurred in connection with the negotiation, execution, and delivery of this Agreement. Seller has paid and will pay the fees, expenses and disbursements of Seller, its agents, representatives, financial advisors, accountants and counsel incurred in connection with the negotiation, execution, and delivery of this Agreement, prior to or such fees shall be included in liabilities and reflected in the calculation of Net Working Capital Calculation.

13.7    **Notices.** Any notice, request, claim, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given if delivered personally, or sent by facsimile or a recognized overnight courier service (with confirmation of receipt), as follows:

If to Purchaser:

> Rock Sound Communications Corporation
> 6675 Sheffield Lane
> Miami Beach, Florida 33141
> Attn: Alan H. Lipkowitz

If to Seller:

> U.S. Digitel, Inc.
> 1909 Tyler Street, 3rd Floor
> Hollywood, Florida 33020

36

412917_1 1/7/00 1:31 pm

Attn: President

or to such other address as the person to whom notice is to be given may have specified in a notice given to the sender as provided herein. Such notice, request, claim, demand, waiver, consent, approval or other communication shall be deemed to have been given as of the date so delivered or first refused.

**13.8    Governing Law.**

(a)    This Agreement has been executed and delivered in and shall be governed by and construed, and enforced in accordance with the laws of the State of Florida without regard for its conflict of interest laws.

(b)    Any matters related to the subject matter of this Agreement, whether brought at law or equity, or under contract, tort, statute or otherwise, shall be adjudicated in a federal or state court of competent subject matter jurisdiction in Florida. Each party hereto irrevocably submits to the personal jurisdiction of such court for the purposes of any Proceeding permitted by this Agreement. Each party hereto waives and agrees not to assert by way of motion, a defense, or otherwise, any claim that it is not subject to the jurisdiction of the above courts, that such Proceeding is brought in an inconvenient forum, or that the venue of such Proceeding is improper.

**13.9    Severability.** If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable in any jurisdiction, the remainder hereof, and the application of such provision to such person or circumstance in any other jurisdiction or to other persons or circumstances in any jurisdiction, shall not be affected thereby, and to this end the provisions of this Agreement shall be severable.

[signature page follows]

37

412917_1 1/7/00 1:31 pm



This Asset Purchase Agreement is executed by the parties as of the day and year first above written.

ROCK SOUND COMMUNICATIONS                    U.S. DIGITEL, INC., a Florida corporation
CORPORATION, a Delaware corporation

By _____          By _____
   Its _Président_____                Its _PRESiDent_____

                                             _____
SHAREHOLDERS                                 Name:  Steve Tashman

_____
Name:

_____
Name:

_____
Name:

_____
Name:

_____
Name:

_____

S

412917_1  1/7/00 1:31 pm

## Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Promissory Note |
| Schedule 1.1(b) | Telephone and Facsimile #'s |
| Schedule 1.17 | Excluded Assets |
| Schedule 4.1 | Jurisdictions |
| Schedule 4.5 | Predecessor Entities |
| Schedule 4.6 | Financial Statements |
| Schedule 4.7 | Liabilities |
| Schedule 4.8 | Accounts Receivable |
| Schedule 4.12 | Leases |
| Schedule 4.14 | Material Agreements |
| Schedule 4.15 | Insurance |
| Schedule 4.16 | Employees |
| Schedule 4.17 | Benefit Plans |
| Schedule 4.18 | Proceedings |
| Schedule 4.19 | Taxes |
| Schedule 4.20 | Adverse Charges |
| Schedule 4.21 | Bank Accounts |
| Schedule 4.23 | FCC Compliance |
| Schedule 4.25(c) | Patents |
| Schedule 4.25(d) | Licenses |
| Schedule 4.28 | Litigation |

S

# PROMISSORY NOTE

$9,200,000.00                                                           January 7, 2000

      FOR VALUE RECEIVED, the undersigned Rock Sound Communications Corporation, a Delaware corporation ("Obligor"), promises to pay to the order of U.S. Digitel, Inc., a Florida corporation ("Payee"), at 1909 Tyler Street, 3rd Floor, Hollywood, Florida 33020, or such other place as Payee may from time to time designate in writing, the principal sum of Nine Million Two Hundred Thousand and 00/100 Dollars ($9,200,000) or such other amount as shall be determined in accordance with the provisions below, and all accrued and unpaid interest thereon, on April 30, 2002. All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement, as defined below.

      The principal amount of this Note is subject to adjustment in accordance with the provisions of Section 2.2 of the Asset Purchase Agreement.

      Except as hereinafter provided, Obligor's obligations and liabilities to Payee under this Note ("Obligor's Liabilities") unpaid from time to time shall bear interest from the date hereof until paid at the rate of six percent per annum, computed on the basis of actual days elapsed over a 365-day year, and payable semi-annually in arrears on July 1 and January 1 of each year.

      This Note is the USD Note referred to in the Asset Purchase Agreement dated as of January __, 2000, by and between Obligor and Payee, to which reference is made for additional terms and conditions which may be applicable to this Note.

      To secure the payment, performance and observance of the Secured Obligations in accordance with the terms thereof, Obligor hereby grants to Payee, for the benefit of Payee, a continuing security interest in all right, title and interest of Obligor in all personal property, whether now owned or existing or hereafter acquired or arising and regardless of where located including, without limitation, the Obligor's accounts, inventory, general intangibles, equipment, and proceeds of all or any of such property, as such terms are defined under the Uniform Commercial Code as in effect on the date hereof in the State of Florida.

      The Obligor, the Payee and any successor holder or beneficiary of this Note agree that the payment from whatever source of the indebtedness from Obligor to Payee arising under or in connection with the Asset Purchase Agreement (the "Subordinated Indebtedness"), shall be subordinate and junior in right of payment to all indebtedness for money borrowed of the Obligor to any bank or other lender, including, without limitation, for working capital (the "Senior Indebtedness"). By acceptance of this Note, Payee confirms and agrees that, notwithstanding any terms or provisions of this Note, the indebtedness evidenced hereby (and any amendments hereto) shall at all time and in all respects be subordinate and junior in right of payment to the Senior Indebtedness, and that each holder of such Senior Indebtedness, with respect to Senior Indebtedness now existing or hereafter arising, shall be deemed to have acquired such Senior Indebtedness in reliance upon the covenants and provisions contained in this Note. As used herein, "subordinate" and "junior" shall mean the following:



(A)    that in the event of any insolvency or bankruptcy proceedings (voluntary or involuntary), or any receivership, liquidation, reorganization or similar proceedings relative to Obligor or its property, then all principal and interest on all Senior Indebtedness shall first be paid in full in cash before any payment by the Obligor on account of principal or interest is made upon the Subordinated Indebtedness, and in such proceedings any payment or distribution of any kind or character whether in cash or property or securities, that may be payable or deliverable by the Obligor in respect or this Note shall be paid or delivered directly to the holders of the Senior Indebtedness for application in payment thereof, unless and until all principal and interest to the date of payment on all Senior Indebtedness shall have been paid and satisfied in full; or

(B)    that in the event the entire amount of the outstanding Senior Indebtedness shall become and be due and payable before its expressed maturity for any reason other than the mere passage of time (under circumstances when the provisions of the immediately preceding clause (a) or the immediately following clause (c) shall not be applicable), Payee shall be entitled to payment by the Obligor under this Note only after there shall first have been paid in full in cash the Senior Indebtedness outstanding at such time (including, without limitation, principal, interest and other amounts due in respect thereof);

(C)    that in the event that any default in payment shall occur and be continuing with respect to the Senior Indebtedness, no payments on account of this Note shall be make by Obligor; and

(D)    in the event that, notwithstanding the provisions of this Note prohibiting such payment or distribution, payee shall receive or retain in violation of such provisions any payment or distribution of any kind or character by the Obligor, whether in cash or property or securities, before all Senior Indebtedness is paid in full in cash, then and in such event such payment or distribution shall be received and held by Payee in trust for the benefit of the holders of the Senior Indebtedness, and shall be paid over or delivered, in the same form as so received (with any necessary endorsements), forthwith to the holders of the Senior Indebtedness for application to the payment or prepayment in full of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full, after giving effect to any concurrent payment or distribution to or for the holders of the Senior Indebtedness.

Upon any distribution of assets of the Obligor referred to in this Note, the holder of this Note shall be entitled to rely upon any order or decree made by any court of competent jurisdiction in which such dissolution, winding-up, liquidation, reorganization, recapitalization or readjustment proceeding is pending, or a certificate of the liquidating trustee or Payee or other Person making any distribution to such holders, for the purpose of ascertaining the Persons entitled to participate in such distribution, the holders of the Senior Indebtedness, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Note.

-2-

No right of any present or future holder of any Senior Indebtedness to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Obligor or by any act or failure to act by any such holder (including any exercise or non-exercise of any right, power or remedy under or in respect of the Senior Indebtedness or any document relating thereto or any release or discharge by any holder of Senior Indebtedness of any guaranty thereof of security therefor), or by any non-compliance by the Obligor with the terms, provisions and covenants of the Asset Purchase Agreement, this Note and any other document relating thereto, regardless of any knowledge of which any such holder may have. The rights of the holders of Senior Indebtedness under this Note shall be automatically reinstated if and to the extent that any payment by the Obligor or any other Person to the holders of Senior Indebtedness is rescinded or must otherwise be returned by any holder of Senior Indebtedness as a result of any proceedings in bankruptcy or reorganization.

Obligor shall be entitled to prepay, in whole or in part, without any penalty, any amount due hereunder.

This Note is submitted by Obligor to Payee in Hollywood, Florida, and shall be deemed to have been made thereat. This Note shall be governed and controlled by the laws of the State of Florida as to interpretation, enforcement, validity, construction, effect, choice of law and in all other respects.

To induce Obligor to issue this Note, Payee irrevocably agrees that, subject to Obligor's sole and absolute election, all actions or proceedings in any way, manner or respect, arising out of or from or related to this Note, shall be litigated in courts having situs within the County of Dade, State of Florida. Payee hereby consents and submits to the jurisdiction of any local, state or federal court located within said county and state.

OBLIGOR AND PAYEE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER, IN CONNECTION WITH, OR RELATING TO THIS NOTE.

IN WITNESS WHEREOF, Obligor has caused this Note to be duly executed on the ___ day of January, 2000.

ROCK SOUND COMMUNICATIONS
CORPORATION, a Delaware corporation

By: _____
Name: Alan H. Lipkowitz
Title: President

#412935 v1 - USD subordinated promissory note.wpd

-3-

# U.S. DIGITEL, INC.
## ASSIGNMENT AND BILL OF SALE

This Assignment and Bill of Sale, dated January 7, 2000, is executed and delivered by U.S. Digitel, Inc., a Florida corporation (the "Seller"), to Rock Sound Communications Corporation, a Delaware corporation (the "Buyer").

KNOW ALL BY THESE PRESENTS, that for good and valuable consideration described in that certain Asset Purchase Agreement (the "Asset Purchase Agreement") by and between the Buyer and the Seller dated as of January 1, 2000, the Seller does hereby sell, transfer, convey, assign, and deliver to the Buyer all of the properties, business, and assets of the Seller of every kind and description, real, personal, or mixed, tangible and intangible, wherever located (except those Excluded Assets of the Seller which are specifically excluded from this sale) as they exist on the date hereon and as defined in the Asset Purchase Agreement as "Acquired Assets."

The Seller represents, warrants, and covenants to the Purchaser, its legal representatives, successors and assigns, that the Seller is the lawful owner of the Acquired Assets and holds right and authority to make the herein described transfer free and clear of all claims, liabilities, obligations, liens, and encumbrances.

The Seller further agrees to execute such additional documents from time to time at the request of the Purchaser as may be reasonably necessary to accomplish the transfer made herein. Any term capitalized but not defined herein shall have the meaning set froth in the Asset Purchase Agreement.

U.S. DIGITEL, INC.

By: _____
Name: David Griffee
Title: President

#412926 v1 - USD assignment and bill of sale to Rock Sound.wpd

F:\WP51\DOC\3500\3561.TAS\CLOSINGS.1

Re:        U.S. Digital, Inc.
Date:      1/7/2000
Our File No:  3561

## CLOSING STATEMENT

1.    Purchase Price              $ 10,000,000.00

2.    Received cash                   800,000.00

3.    Promissory Note            $  9,200,000.00

      Net Amount Due                   -0-


Date: _____        _____

                             _____

                             _____

                             _____

                             _____

# U.S. DIGITEL, INC.
## ASSUMPTION AGREEMENT

This Assumption Agreement is made as of January 7, 2000, by and between Rock Sound Communications Corporation, a Delaware corporation (the "Buyer"), and U.S. Digitel, Inc., a Florida corporation (the "Seller"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement of even date herewith (the "Asset Purchase Agreement") by and between the Buyer and Seller.

### Recitals

Pursuant to the Asset Purchase Agreement, the Seller is concurrently herewith selling and assigning to the Buyer all of the Seller's right, title, and interest in, to, and under the Acquired Assets.

In partial consideration for such sale and assignment of the Acquired Assets, the Asset Purchase Agreement requires the Buyer to assume and agree to pay or discharge when due certain liabilities and obligations of the Seller.

The Asset Purchase Agreement also provides that the Buyer shall not assume, and the Seller shall retain and be responsible for, any other liabilities or obligations of the Seller.

NOW, THEREFORE, pursuant to the terms of the Asset Purchase Agreement and for good and valuable consideration, the parties hereto agree as follows:

### Assumption

1. _Assumption_. The Buyer hereby assumes and shall subsequently pay, discharge, and perform when lawfully due the Assumed Liabilities; provided, however, that the Buyer shall not assume or otherwise be responsible for any other Liability, contract, commitment, or obligation of any nature whatsoever.

2. _Third Parties_. The assumption by the Buyer of the Assumed Liabilities as herein provided is not intended to expand the rights or remedies of any third party against the Buyer as compared to the rights and remedies which such third party would have had against the Seller had the Buyer not consummated the transactions contemplated by the Asset Purchase Agreement. Nothing herein contained shall, or shall be construed to, prejudice the right of the Buyer to contest any claim or demand with respect to any obligation or liability assumed hereunder and the Buyer shall have all rights which the Seller may have or have had to defend or contest any such claim or demand.

3. _Subject to the Asset Purchase Agreement_. The scope, nature, and extent of the Assumed Liabilities are expressly set forth in the Asset Purchase Agreement. Nothing herein contained shall itself change, amend, extend, or alter (nor shall it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Asset Purchase Agreement in any manner whatsoever. This instrument does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the Asset Purchase Agreement. In the event of any conflict or other difference between the Asset Purchase Agreement and this instrument, the provisions of the Asset Purchase Agreement shall control.

4.    Governing Laws.  This Agreement shall be construed in accordance with and governed by the Laws of the State of Florida, without giving effect to any choice of law or conflict of law provisions or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida.

5.    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the Buyer and the Seller and their respective successors and assigns, but shall not create any right of subrogation or other right on the part of any other person.

6.    Amendment, Waiver, and Termination.  This Agreement may not be amended, waived, or terminated except by a writing signed by the parties hereto.

7.    Headings.  The headings in this Agreement are for the purpose of reference only and shall not limit or otherwise affect the meaning thereof.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

ROCK SOUND COMMUNICATIONS CORPORATION

By:  _____
     Name: Alan H. Lipkowitz
     Title: President

U.S. DIGITEL, INC.

By:  _____
     Name: David Griffee
     Title: President

412929.1

-2-

## U.S. DIGITEL, INC.
## SECRETARY'S CERTIFICATE AS TO SELLER'S
## OFFICERS AND DIRECTORS' RESOLUTIONS

I, Lisa Tashman, do hereby certify that:

1.    I am the duly elected, qualified and acting Secretary of U.S. Digitel, Inc. ("Seller"), a corporation duly organized, existing and in good standing under the laws of the State of Florida.

2.    I am the keeper of the corporate records and seal of Seller.

3.    The following named persons are the present officers of Seller, each duly elected, qualified and acting as such:

David Griffee
President


Lisa Tashman
Secretary/Treasurer

4.    The following is a full, true and correct copy of resolutions duly unanimously adopted by Seller's Board of Directors, by meeting or by unanimous written consent dated as of January ⎯7, 2000, which meeting or consent was duly convened or executed in accordance with Seller's Articles of Incorporation and By-Laws and all applicable laws, and which resolutions have not in any way been modified or rescinded, but are in full force and effect:

"RESOLVED, that David Griffee or Lisa Tashman, the President and Secretary/Treasurer of the Seller (each such person being hereinafter referred to as a "Designated Person"), each, separately, is hereby authorized, directed and empowered now and from time to time hereafter to make, execute and deliver for and on behalf of and in the name of Seller an Asset Purchase Agreement, dated as of January 1, 2000, by and among Seller and Rock Sound Communications Corporation ("Purchaser"), and all other agreements, instruments and documents contemplated by the Asset Purchaser Agreement (all and each of the foregoing agreements, instruments and documents, the "Transaction Documents") as he or she may, in his or her sole discretion, deem advisable, necessary, expedient, convenient or proper;" and

"BE IT FURTHER RESOLVED, that the Transaction Documents may contain such provisions, terms, conditions, covenants, warranties and representations as such Designated Person may in his or her sole discretion deem advisable, necessary or expedient;" and

"BE IT FURTHER RESOLVED, that such Designated Person is hereby authorized, directed and empowered for and on behalf of and in the name of Seller now and from time to time hereafter, as he or she in his or her sole discretion deems advisable,

necessary, expedient, convenient or proper, to: (a) execute and deliver to Purchaser such agreements, instruments and documents as Purchaser may request or require to effectuate the purpose and intent of the Transaction Documents or these Resolutions; (b) amend, modify, alter, extend, renew or otherwise change any of the provisions, terms, conditions, covenants, guaranties or representations contained in the Transaction Documents; and, (c) execute and deliver to Purchaser and direction or authorization for the transfer or other disposition of any property, real or personal, belonging to Seller;" and

"BE IT FURTHER RESOLVED, that such Designated Person is hereby authorized, directed and empowered to do and perform all acts and things as he or she deems advisable, necessary, expedient, convenient or proper in order to consummate fully all of the transactions contemplated under the Transaction Documents or these Resolutions;" and

"BE IT FURTHER RESOLVED, that this consent hereby ratifies, approves and confirms any and all acts and things that such Designated Person has done or may do in any way relating to or arising from or in connection with the Transaction Documents and these Resolutions and such acts and things of such Designated Person shall at all times receive full faith and credit by Purchaser without the necessity of inquiry by Purchaser;" and

"BE IT FURTHER RESOLVED, that the authorizations herein set forth shall remain in full force and effect for the term of each of the Transaction Documents and all renewal terms thereof".

IN WITNESS WHEREOF, I have hereunto subscribed my name as Secretary of Seller as of the 7 day of January, 2000.

_Lisa Tashman_

Lisa Tashman, Secretary

412928.1

-2-

# U.S. DIGITEL, INC.
## OFFICER'S CERTIFICATE

The undersigned, in his capacity as President of U.S. Digitel, Inc., a Florida corporation ("Seller"), hereby certifies to Rock Sound Communications Corporation, a Delaware corporation ("Purchaser"), pursuant to Section 6.1 and 6.3 of that certain Asset Purchase Agreement dated as of January ___, 2000 (the "Agreement"), that:

i. All of the representations and warranties of Seller in the Agreement are true, correct and complete as of the date hereof;

ii. All of the terms, covenants, agreements and conditions of the Agreement to be complied with, performed or satisfied by Seller on or before the Closing have been duly complied with, performed or satisfied; and

iii. There has been no change in the business, operations, affairs, prospects, properties, assets, existing and potential liabilities, obligations, profits or condition (financial or otherwise) of Seller, since November 30, 1999, which, taken as a whole, have had or will have a Material Adverse Effect.

IN WITNESS WHEREOF, I have set my hand and caused this Certificate to be delivered this ___th day of January, 2000.

By: _____
Name: David Griffee
Title: President

#412930 v1 - USD officer's certificate for asset purchase agreement.wpd

# ESCROW AGREEMENT

Brian R. Hersh as escrow agent shall take possession and is authorized to amend the original asset purchase agreements for the purpose of amending the said agreements in the following particulars:

1. Regarding TDC, page 4, paragraph 1.1.4 (line 5) EXCLUDED ASSETS include "<u>any claims of the seller against any person or otherwise in a pending lawsuit as of the date of closing</u>"
2. Page 9, 2.2 (line 4) differs "<u>according to GAAP</u>"
3. Page 34, paragraph 10.5, (line 1) "<u>non-withstanding the provision of section 10.3</u>," upon....
4. Regarding USD, page 34, paragraph 10.5 (line 1) "<u>non-withstanding the provision of section 10.3</u>," upon....
5. Page 9, 2.2 (line 4) differs "<u>according to GAAP</u>"

_____  1/7/2000

Brian R. Hersh as Escrow Agent

_____

Rock Sound Communications Corp.
By: _____

_____

Telecard Dispensing Corp.
By: _____

U.S. Digitel, Inc.
By: _____

# Letter of Direction

It is agreed / directed between Telecard Communications and the undersigned on this January 7,2000 as follows:

1.  Regarding the two million dollar payment (first scheduled payment –FSP) from Rocksound Communication Corporation (RSC) due February seventh the entire amount shall be paid only to Steve Mishkin and Harris Cohen as their interest may lay.

2.  The two million dollar payment shall be wired to the trust account of Brian Hersh and no other place and shall be deemed paid upon receipt to Brian Hersh

3.  Cohen and Mishkin shall receive their five thousand dollar salary and insurance until the FSP (paragraph two above) also they shall receive their insurance until their FSP and until the sixty days there after.

4.  Until final payment of the four million dollar note, RSC shall pay Ten thousand dollars per week directly to Cohen and Mishkin (one half each) to be offset the final payment.

Telecard Dispensing Corp.

_____
Steve Mishkin

_____
Harris Cohen

Rocksound Communications Corporation

_____